G. Patrick Watson, Georgia Bar No. 741226
patrick.watson@bclplaw.com
Lindsay S. Johnson, Georgia Bar No. 648391
lindsay.johnson@bclplaw.com
Sakinah N. Jones, Georgia Bar No. 550715
sakinah.jones@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
1201 West Peachtree Street
Suite 1400
Atlanta, Georgia 30309

Attorneys for Plaintiff

HOME DEPOT U.S.A., INC.

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| HOME DEPOT U.S.A., INC.,<br><br>      Plaintiff,<br><br>v.<br><br>LAFARGE NORTH AMERICA INC.,<br><br>      Defendant. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Home Depot U.S.A., Inc. ("Home Depot" or "Plaintiff") brings this Complaint against Lafarge North America Inc. ("Lafarge" or "Defendant") for damages and alleges as follows:

## NATURE OF THE ACTION

1.  This lawsuit alleges a conspiracy in the market for Drywall in the United States.

2.  Beginning at least as early as September 2011 and continuing through at least the end of 2013, the exact dates being unknown to Home Depot, (the "Conspiracy Period"), Lafarge and its co-conspirators agreed, combined, and conspired to raise, maintain, and stabilize at artificial levels the prices at which Drywall was sold in the United States. As set out below, the

conspiracy was characterized by extreme price increases, supply restrictions, and the discontinuation of a long-standing pricing policy termed "job quoting." These shifts in the industry were unjustified by the poor economic conditions of the time.

3.      "Drywall," also known as wallboard, sheetrock, or gypsum, is the primary material used in constructing walls and ceilings in both residential and commercial properties. Drywall is easy to install and finish and has sound-dampening, fire-retarding, and/or moisture control qualities. There are no reasonably functional or economic substitutes.

4.      Collectively, Lafarge and its co-conspirators are the nation's largest suppliers of Drywall. The Drywall market is highly concentrated, with easy opportunities to conspire, and susceptible to collusion. There are high barriers to entry and product price inelasticity.

5.      Demand for Drywall is related to the level of activity in the construction industry. Following a boom period that peaked in 2006, the subsequent downturn in the construction industry caused the prices of Drywall to drop significantly. These dire circumstances motivated Lafarge and its co-conspirators to engage in the illegal conspiracy detailed herein.

6.      The conspiracy was effectuated by direct communications between Drywall manufacturers (in person at trade association meetings and via telephone calls, emails, and text messages) as well as through third parties which transmitted messages on the manufacturers' behalf. Directly and through third parties, Lafarge and its co-conspirators shared confidential and competitively-sensitive information regarding, among other things, supply and demand, market trends, capacity, sales forecasts, customers, and current and future pricing for Drywall with the goal of raising prices to anti-competitive levels.

7.      Home Depot, a nationwide home improvement retailer, is the single largest purchaser of Drywall in the United States. As part of its normal business operations, Home

Depot purchased hundreds of millions of dollars of Drywall annually during the Conspiracy Period, primarily for sale in its retail stores, and it overpaid for that Drywall as a result of Lafarge and its co-conspirators' illegal conspiracy. The effect of the conspiracy was to artificially raise the prices of Drywall purchased by Home Depot.

## JURISDICTION AND VENUE

8.      Home Depot brings this action under Section 4 of the Clayton Act (15 U.S.C. § 15) to recover damages against Lafarge due to its violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Home Depot's claims arising under Section 1 of the Sherman Act and Section 4 of the Clayton Act.

10.     This Court has jurisdiction over Lafarge under Section 12 of the Clayton Act, 15 U.S.C. § 22.  The activities of Lafarge and its co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in the United States. In particular, Lafarge and its co-conspirators' conspiracy directly and substantially affected the price of Drywall purchased by Home Depot nationwide, including in this District. These effects give rise to Home Depot's antitrust claims.

11.     Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act (15 U.S.C § 22) and 28 U.S.C. § 1391(b), and because Home Depot's headquarters is in this District, a substantial part of the events giving rise to Home Depot's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Lafarge and its co-conspirators have an agent, maintain an office, or do business in this District.

## INTERSTATE TRADE AND COMMERCE

12.     Lafarge and its co-conspirators' activities, as described herein, were within the flow of and had a substantial effect on, the interstate commerce of the United States, including in the Northern District of Georgia, as Lafarge intended.

13.     Lafarge and its co-conspirators manufactured, distributed, and sold Drywall in an uninterrupted and continuous flow of interstate commerce among the United States and its territories. Their anticompetitive scheme consequently inflicted a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## PARTIES

14.     Plaintiff Home Depot U.S.A., Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Home Depot operates over 2,200 retail stores in the United States, Canada, and Mexico and is in the business of selling building and home improvement products, including Drywall.

15.     Defendant Lafarge North America Inc. is a corporation organized, existing, and doing business under the laws of the State of Maryland, with its headquarters in Dundee, Michigan. During the Conspiracy Period, Lafarge manufactured, marketed and/or sold Drywall to buyers in the United States, including in this District. In 2011, approximately 10% of domestic Drywall sales were made by Lafarge.

16.     Lafarge sold its Drywall business to Continental Building Products, Inc. on August 30, 2013. Thereafter, Continental continued to sell Drywall under the Lafarge name and used Lafarge's specifications for Drywall for up to twelve months after the sale. Notwithstanding the change in ownership, the high prices resulting from Lafarge's wrongdoing continued to injure Home Depot.

17.     During the Conspiracy Period, Home Depot directly purchased, for its own use and for resale, Drywall that was manufactured and sold by conspirators and others.

## AGENTS AND CO-CONSPIRATORS

18.     Lafarge's officers, directors, agents, employees, or representatives engaged in the conduct alleged in this Complaint in the usual management, direction, or control of Lafarge's business or affairs.

19.     Lafarge is also liable for acts done in furtherance of the alleged conspiracy by companies it acquired through mergers and acquisitions.

20.     Co-conspirator New NGC, Inc. ("National Gypsum") is a wholly-owned subsidiary of Delcor, Inc., which is referred to as National Gypsum Company, and is a privately-held corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Charlotte, North Carolina. National Gypsum manufactured and distributed Drywall to buyers in the United States during the Conspiracy Period. In 2011, approximately 21−26% of domestic Drywall sales were made by National Gypsum.

21.     Co-conspirator American Gypsum Company LLC ("American Gypsum") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Dallas, Texas. It is a subsidiary of Eagle Materials Inc. American Gypsum manufactured and distributed Drywall to buyers in the United States during the Conspiracy Period. In 2011, approximately 10% of domestic Drywall sales were made by American Gypsum.

22.     Co-conspirator CertainTeed Gypsum, Inc. ("CertainTeed") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Tampa, Florida. CertainTeed manufactured and distributed Drywall to buyers in

the United States during the Conspiracy Period. In 2011, approximately 10.3−11.7% of domestic Drywall sales were made by CertainTeed.

23.     Co-conspirator PABCO Building Products, LLC is a corporation organized, existing, and doing business under the laws of the State of California, with its headquarters in Rancho Cordova, California and is referred to collectively with its subsidiary PABCO Gypsum Company as "PABCO." PABCO manufactured and distributed Drywall to buyers in the United States during the Conspiracy Period. In 2011, 4% of domestic Drywall sales were made by PABCO.

24.     Co-conspirator USG Corporation is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. Through its wholly-owned subsidiaries, United States Gypsum Company and L&W Supply Corporation, USG Corporation is a leading manufacturer and distributor of Drywall. USG Corporation and its subsidiaries are referred to collectively as "USG."

25.     Co-conspirator United States Gypsum, a wholly-owned subsidiary of USG Corporation, is organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. USG manufactured and sold Drywall to buyers in the United States during the Conspiracy Period. In 2011, approximately 24−26% of domestic drywall sales were made by USG.

26.     Co-conspirator TIN Inc., d/b/a Temple-Inland Inc. ("Temple-Inland"), a wholly-owned subsidiary of International Paper Co., is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Memphis, Tennessee. Temple-Inland manufactured and distributed Drywall to buyers in the United States during the Conspiracy Period. In 2011, approximately 7% of domestic Drywall sales were made by

Temple-Inland. In 2017, Temple-Inland Building Products, a division of Temple-Inland, was sold to Georgia-Pacific LLC.

27. When Home Depot refers to a corporate family or companies by a single name in this Complaint, it is alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

28. For example, during the Conspiracy Period or until October 31, 2016, co-conspirators USG Corporation, United States Gypsum Company, and L&W Supply Corporation—all members of the same corporate family—acted as agents and engaged in conspiratorial acts on behalf of each other. Co-conspirators L&W Supply and United States Gypsum Company were both wholly-owned and controlled subsidiaries of USG Corporation. Both L&W Supply and United States Gypsum Company sold USG-branded gypsum products in the United States at USG Corporation's direction. All three companies enjoyed direct and frequent contact between one another and they were considered by many within and outside the companies to be a single entity. Consistent with this understanding, USG Corporation and L&W Supply shared common membership among their respective Boards of Directors. Most, if not all of these L&W Supply executives worked in the same office location as other high-level executives from USG Corporation. USG Corporation and L&W Supply also held joint strategy meetings involving executives from both companies. USG Corporation, United States Gypsum

Company, and L&W Supply all shared the same legal, accounting, finance, human resource, and other headquarter resources. USG Corporation's actions demonstrated ownership and control over L&W Supply and United States Gypsum Company, including by directing its subsidiary companies to purchase and sell USG Drywall products, resolving disputes between L&W Supply and United States Gypsum Company on Drywall pricing, and issuing corporate directives regarding pricing and sales to its subsidiary companies. Thus, each entity within the corporate family was an active, knowing participant in the alleged conspiracy. On October 31, 2016, USG sold its building products distribution business, L&W Supply Corporation, to ABC Supply Co., Inc. for $670 million.

## FACTUAL ALLEGATIONS

I.    **DRYWALL**

    A.    **Characteristics and Production**

29.    Gypsum is a very soft sulfate mineral composed of calcium sulfate dihydrate, with the chemical formula $CaSO_4.2H_2O$, commonly extracted from mines. It is one of the most widely used minerals in the world and is mined in the United States and elsewhere or synthetically produced using residue from coal-burning plants.

30.    Typically, manufacturers create Drywall by sandwiching a core of gypsum between two sheets of heavy paper. When the core sets and is dried in a large drying chamber, the sandwich becomes rigid and strong enough for use as a building material. Manufacturers also sometimes sandwich gypsum between fiberglass mats for use primarily in the exterior of commercial buildings, but that product occupies a smaller niche market distinct from the Drywall market and the uses for which Drywall is employed.

31.    Production of Drywall consumes around 90% of gypsum mined in the United

States.

32.     Drywall differs from products like plywood, hardboard, and fiberboard because of the non-combustible core, primarily comprised of fire-resistant gypsum. It also differs from glass-faced sheathing materials.

33.     Because Drywall offers a variety of unique benefits unavailable in other products, the vast majority of all new residential and commercial construction projects in the United States use Drywall. Generally, contractors install wooden pieces of frame and workers then attach Drywall to the frame with either screws or nails before seaming individual sheets of Drywall together using a special compound, leaving an even and flat surface.

34.     Because Drywall fills the void between wall studs at a cheap price (while boasting sound-dampening, fire-retarding, and/or moisture control qualities), there is no economically viable substitute for Drywall. While consumers can put a premium product between studs for sound-proofing or other purposes, only a small percentage of customers are willing to bear the expense of doing so.

35.     Safety concerns—particularly with respect to Chinese gypsum wallboard—and transportation costs prevent imported gypsum wallboard from constituting an adequate substitute for domestically-produced Drywall.

36.     In their non-litigation business discussions and analyses, Lafarge and its co-conspirators consistently refer to the United States sales of Drywall as a market.

37.     Accordingly, there are no adequate substitutes for Drywall, and Drywall in the United States constitutes a distinct market.

38.     Collectively, Drywall sales in the United States, predominated by Lafarge and its co-conspirators, exceed $3 billion dollars annually. Most Drywall manufacturers are vertically

integrated. In other words, these companies participate in successive steps in the production process, starting with mining and fabricating other principal components such as paper, and then use these inputs to fabricate Drywall as it is sold to customers.

**B.     The Drywall Market Is Amenable To Collusion**

39.     The Drywall market's structural features make collusion particularly feasible and attractive. Specifically, the market: (1) is highly concentrated, (2) features inelastic prices, (3) has high barriers to entry, (4) produces a commodity product, and (5) offers numerous opportunities for collusion.

*1.     The Drywall Market is Highly Concentrated*

40.     The smaller the number of firms that dominate a market, the more highly concentrated it is. The Drywall market in the United States is very highly concentrated. As of 2011, Lafarge and its co-conspirators taken together accounted for more than 90% of domestic Drywall sales with their respective market shares as follows:

| Manufacturer | Approximate Market Share in 2011 |
| --- | --- |
| USG | 24−26% |
| National Gypsum | 21−26% |
| CertainTeed | 10.3−11.7% |
| American Gypsum | 10% |
| Lafarge | 10% |
| TIN | 7% |
| PABCO | 4% |

41.     The level of market concentration grew over the last two decades. In the 1990s, the market included several smaller regional manufacturers with only one or two plants each.

Before 1997, there were as many as thirteen companies in the United States manufacturing Drywall at 78 plants. After 2002, however, the industry consolidated and references to smaller, regional competitors ceased. The number of market participants steadily declined as well until, by 2010, just eight companies in the United States manufactured Drywall at 62 plants. The Drywall market has become even more concentrated in recent years with additional consolidations and acquisitions.

42.     This increased market concentration facilitated the conspiracy because a potential cartelist would need only to conspire with, and police, a limited number of companies to be successful. This concentration facilitated not only the fixing of prices but also the coordination of pricing terms (including the elimination of job quotes). Moreover, because Lafarge and its co-conspirators owned and controlled approximately ninety percent of the Drywall manufacturing capacity in the United States in 2011, they collectively had the market power to impose and sustain the large price increases and elimination of the job quote practice described herein.

43.     Basic industrial organization economics teach that higher levels of concentration foster the formation and operation of cartels by reducing the number of firms needed to agree to fix prices and monitor a cartel.

44.     The measure industrial organization economists frequently use in evaluating market concentration is "CR$_4$": the share of product sales accounted for by the four largest firms in a given industry. A seminal study of Department of Justice price-fixing investigations found that 76% of cartels occurred in sectors with a CR$_4$ score of 50% or higher. As demonstrated above, the CR$_4$ for the Drywall market as of 2011, when the collusive conduct began, was at least 71%, a level of market concentration highly conducive to cartelization. *See also* H. Shipp, *Gypsum Product Manufacturing in the U.S.*, Ibis World Indus. Report 27 (2013) ("The four

largest players currently account for 88.9% of industry revenue.").

45.    Prior to the fall of 2011, as is typical in highly concentrated markets, one of the two largest Drywall manufacturers (USG or National Gypsum) generally initiated price increases, which the other manufacturers tended to follow. Also prior to the fall of 2011, Lafarge and American Gypsum developed reputations as price-cutters causing the other co-conspirators to return to competitive pricing.

### 2.    The Prices for Drywall are Inelastic

46.    "Elasticity" describes the sensitivity of the amount demanded of a product to a change in the price charged for it. The more sales of a certain product decline as the price of that product increases, the more elastic the prices of that product. Conversely, inelastic pricing exists when the amounts sold of a certain product do not decline significantly even when the price of that product increases significantly.

47.    In other words, when customers have few or no practical alternatives to a given product in the form of cheaper products of similar quality and functionality, they will pay higher prices for the product they need with relatively little reduction in the quantity they purchase.

48.    For a cartel to profit by raising prices above competitive levels, pricing must be inelastic. Otherwise, the price increase would result in such a substantial decline in quantities sold as customers purchased substitute products or declined to buy altogether, rendering the price increase counter-productive for cartel members. Thus, price inelasticity facilitates collusion.

49.    Pricing for Drywall is highly inelastic, as there are no adequate economic substitutes for the product. Thus, the cartel's substantial increase in Drywall prices predictably did not lead to a substantial drop in the quantities sold.

50.    In short, Lafarge and its co-conspirators took advantage of the high inelasticity of

Drywall prices in order to raise prices to supra-competitive levels, generating more revenue and profit than they could have obtained in a competitive marketplace.

           3.      *There are High Barriers to Entry*

51.     Without barriers to entry, cartels that raise prices to supra-competitive levels attract new entrants seeking the supra-competitive profits accompanying those prices. Left unchecked, that process would result in steadily increasing supply exerting downward pressure on prices, ultimately driving them back to competitive levels. Where high barriers to entry exist, however, new entrants are less likely to enter the market or refrain from entering it altogether. Thus, barriers to entry facilitate the formation and maintenance of cartels.

52.     Substantial barriers preclude, reduce, or make entry into the Drywall market so difficult in the United States as to prevent the existence of new entrants from providing a competitive discipline to the market.

53.     Entry into the Drywall market would require significant capital, around $300 million, for items such as a new plant with equipment, before considering other requirements such as obtaining regulatory approvals, building out the transportation and electrical infrastructure for distribution, and acquiring labor with the requisite skill and experience. Constructing the plants and acquiring the equipment in particular would be a lengthy process requiring at least 18 to 36 months, if not longer, because such items must conform to the particular requirements of the operation and its location.

54.     Moreover, as alleged above, most Drywall manufacturers are vertically integrated. Therefore, to compete profitably in the Drywall market, a new entrant would have to put together the components necessary to operate at the various vertical levels occupied by the incumbents. Consequently, the new entrant would have to acquire or purchase access to one of a limited

number of gypsum sources, develop a distribution network of warehouses and shipping, and build out the sales and customer service staff to market and support its products.

55.     Additionally, imports do not provide a reasonably interchangeable substitute for domestic Drywall. Because of safety and quality concerns associated with foreign Drywall, and with Chinese Drywall in particular, as well as transportation costs associated with imports, purchasers have no meaningful alternative to domestic Drywall. Imports account for *de minimis* sales of domestic Drywall.

56.     These high barriers to entry inspired and enabled Lafarge and its co-conspirators' anti-competitive scheme, reassuring the conspirators that new entrants could not emerge to undercut their supra-competitive prices or offer an alternative to their supply restrictions and prohibition of job quote pricing.

### 4.     Drywall is a Commodity Product

57.     A commodity product is one that is essentially uniform across producers. Thus, while the quality of a given commodity may differ slightly from manufacturer to manufacturer, any one manufacturer's product is essentially interchangeable with another's. Drywall is a commodity product.

58.     Drywall must meet specified minimum standards established by the ASTM and UL in order to be compliant with applicable building codes for construction projects. Such compliance renders nearly all Drywall identical in all material aspects.

59.     In addition, Drywall is sold primarily in two standardized sizes: 1/2 inch thick wallboard and 5/8 inch thick wallboard. Drywall is primarily produced in 12 by 4 foot sheets.

60.     Drywall manufactured by Lafarge and its co-conspirators is functionally interchangeable. Drywall made by one manufacturer does not differ significantly from that made

by another, and purchasers can easily substitute one manufacturer's Drywall for another's.

> 5.    *Numerous Opportunities to Collude*

61.    As further detailed below, Lafarge and its co-conspirators had numerous opportunities to conspire to fix prices and coordinate pricing policies, including through trade association meetings and activities and communications with industry analysts.

**C.    The Drywall Industry's History of Collusive Behavior**

62.    The price-fixing conspiracy alleged herein is not Lafarge's or its co-conspirators' first experience with violating antitrust laws.

63.    In 1948, in *United States Gypsum Co. v. National Gypsum Co.*, 333 U.S. 364 (1948), the United States Supreme Court determined there was sufficient evidence to uphold a complaint alleging that Drywall manufacturers, including USG, violated the Sherman Act by colluding to fix prices on not only Drywall, which was then patented, but also affiliated products, by means of standardizing their production and final output, regulating distribution, and instituting a regime of minimum resale prices.

64.    In 1971, a federal court found manufacturers, including USG and National Gypsum, engaged in a conspiracy to fix the price of Drywall. *See Wall Prods. Co. v. Nat'l Gypsum Co.*, 326 F. Supp. 295 (N.D. Cal. 1971).

65.    Later in the 1970s, a jury convicted manufacturers, including USG and National Gypsum, of committing felonies by engaging in a nationwide cartel inflating Drywall prices. While those convictions were reversed on appeal due to faulty jury instructions, on remand from the United States Supreme Court, the Third Circuit found the evidence sufficient to support the conclusion that the defendants had conspired to violate the antitrust laws. *See United States v. U.S. Gypsum Co.*, 600 F.2d 414, 419–20 (3d Cir. 1979).

15

66.     In 2002, the European competition authority fined four gypsum companies—including Lafarge and a predecessor of CertainTeed (BPB PLC)—$455 million for conspiring to inflate prices from 1992 through 1998.

**D.     The Drywall Market Was In Dire Condition in Fall 2011**

67.     Between 2001 and mid-2006, the Drywall industry flourished alongside the housing boom. However, the end of the housing boom caused a significant decline in the Drywall industry.

68.     From mid-2006 to September 2011, demand for Drywall declined by over 50%. Also by 2011, Drywall prices were approximately 35% below where they were during the peak of the housing boom.

69.     This drop in demand resulted in significant overcapacity. Drywall manufacturers, including Lafarge and USG, were operating at roughly 50% capacity by fall 2011.

70.     These economic forces combined to create strong downward pressure on Drywall prices.

**E.     Failed Efforts to Increase Prices Prior to Fall 2011**

71.     In the first three quarters of 2011, with the housing market still near all-time lows, individual Drywall manufacturers attempted to implement price increases on multiple occasions.

72.     Each such attempt failed because of price competition. When individual manufacturers informed their customers that they were increasing prices, those customers would in turn inform the manufacturer that they could purchase Drywall elsewhere for lower prices. If the manufacturer nevertheless insisted on a price increase, it would lose the customer to a lower-priced competitor.

73.     Moreover, if a manufacturer lost customers to competitors due to price

competition, it typically could not immediately regain those customers by dropping prices. This is because competing manufacturers would often use volume rebate programs to incentivize customers. Because customers only receive volume rebates when they achieve certain purchase volume thresholds from an individual manufacturer in a particular year, switching the manufacturer from whom they purchase mid-year would put those rebates at risk.

74.     Thus, the consequences of independently raising prices was not just a short-term and temporary drop in business, but rather a long-term (and potentially permanent) loss of a customer, even if the manufacturer later reversed its price increase.

## II.     THE CONSPIRACY

75.     Beginning at least as early as September 2011, Lafarge and its co-conspirators implemented a multi-faceted anticompetitive scheme to raise and then maintain Drywall prices at supra-competitive levels, to eliminate the prevailing industry practice of providing "job quotes," and to restrict the supply of Drywall.

### A.     Conspiratorial Communications

#### 1.     *Phone Calls, Emails, and Text Messages Among Former Colleagues*

76.     Lafarge and its co-conspirators directly communicated by phone calls, emails, and text messages to effectuate the conspiracy.

77.     There are close connections between certain manufacturers' executives and sales personnel.

78.     For example, many former USG employees have migrated to American Gypsum and continued to communicate with their former colleagues at USG.  Most significant of these American Gypsum employees are David Powers, President of American Gypsum, and Keith Metcalf, Senior Vice President of Marketing, Sales and Distribution at American Gypsum (and

Vice President of Gypsum Sales at Eagle Materials), who signed American Gypsum's letters eliminating job quotes and announcing price increases on September 20, 2011 and August 22, 2012. Both are former senior executives at USG. Similarly, the National Account Manager at American Gypsum, Charles Olson, previously held that same position at USG. Further, the Director of Sales at American Gypsum since 2003, David Bates, was a district sales manager for USG from 1994 until his move to American Gypsum. The significance of these channels of communications is evident from the fact that American Gypsum sent the first price announcement letter followed almost immediately by USG, as discussed below.

79.     As another instance of how such inter-corporate relationships furthered the conspiracy, Mr. Powers was a friend and former USG coworker of Foster Duvall (Sales Manager, PABCO). During the Conspiracy Period, they communicated regarding Drywall. Mr. Powers, who had been pushing for the elimination of job quotes for some time, called Mr. Duvall and spoke for 19 minutes the day before American Gypsum announced its first price increase on September 20, 2011. Their discussion was memorialized in subsequent email exchanges among individuals at PABCO.

80.     Various other individuals were employed by more than one Drywall manufacturer. For example, Wayne Wilson was a former sales rep at USG before joining Lafarge in September 2003.

### 2.     Trade Association Meetings

81.     Lafarge and its co-conspirators also utilized trade association meetings to effectuate their conspiracy.

82.     The Gypsum Association, founded in 1930, is comprised almost entirely of co-conspirators, with most having a representative appointed to the Gypsum Association's Board of

Directors. During 2011–2012, the Board of Directors included: Past Chairman Stephen Raley (TIN), First Vice President John K. Donaldson (CertainTeed), Second Vice President Joseph Holmes (USG), and Treasurer Craig Robertson (National Gypsum). For 2012–2013, the following individuals were on the Board of Directors: Chairman Joseph Holmes (USG), First/Second Vice Chairman Craig Robertson (National Gypsum), and Treasurer Ryan Lucchetti (PABCO). For 2013–2014, the following individuals were on the Board of Directors: Chairman Craig Robertson (National Gypsum), First Vice-Chairman Ryan Lucchetti (PABCO), and Second Vice-Chairman/Treasurer David Engelhardt (CertainTeed).

83.     The Gypsum Association holds many meetings throughout the year, including meetings of the Board of Directors. The Gypsum Association meetings are attended by many employees of Lafarge and its co-conspirators, including their CEOs and executives. The meetings feature not only formal seminars and presentations, but also more informal dinners, sporting activities, and side trips, where conspirators can easily and freely discuss pricing.

84.     In February 2011, the Gypsum Association held a Board Meeting in San Francisco, California; in March 2011, a Committee Meeting in Charleston, South Carolina; in June 2011, a Board Meeting in Atlanta, Georgia; in October 2011, a Board Meeting and a Committee Meeting in Broomfield, Colorado; in March 2012, a Board Meeting and a Committee Meeting in New Orleans, Louisiana; in October 2012, a Board Meeting and Committee Meeting in Rancho Mirage, California; and in April 2013, a Board Meeting in Tucson, Arizona. Lafarge and its co-conspirators had numerous opportunities to conspire, hatch, and maintain the conspiracy at these various Gypsum Association meetings.

85.     Lafarge also belongs to the Association of the Wall and Ceiling Industry ("AWCI"). Representatives of Lafarge and its co-conspirators attended an AWCI INTEX Expo

and meeting in Las Vegas, Nevada from April 2–7, 2011. Attendees included Jay Conlin (Lafarge), Stephen DeMay (Lafarge), Isabelle Shiffrin (Lafarge), Robbe Pearson (Lafarge), Wayne Wilson (Lafarge), David Bates (American), Keith Metcalf (American), Keith Metcalf (American), Matt Byrne (USG), Steve Bjorklund (USG), Christopher Griffin (USG), Scott Blanchard (USG), Rob Waterhouse (L&W), Donna Sue Mims (PABCO), Mark Burkhammer (PABCO), Philip Kohl (PABCO), Ryan Lucchetti (PABCO), Todd Thomas (PABCO), Bill Campbell (TIN), Jay Wyatt (TIN), Stephen Raley (TIN), Bill Kelly (National), Scott Crutchfield (National), Craig Weisbruch (National), Duane Wood (National), Kurt Withrock (National), John Donaldson (CertainTeed), and Steve Hawkins (CertainTeed). On April 5, 2011, Lafarge and/or its co-conspirators attended the "Supplier and Manufacturers Committee" meeting.

86.     Following this meeting, Lafarge and its co-conspirators began preparing for the elimination of job quotes, a significant and drastic change to the industry that would be uniformly enforced through the conspiracy later that year.

87.     Several months later, representatives of Lafarge and/or its co-conspirators also attended the AWCI Industry Executive Conference and Committee Week in Coeur d'Alene, Idaho from September 13–16, 2011, with over 140 attendees. The attendees at these meetings typically stay at the same hotel.  USG sponsored that entire event while National Gypsum sponsored the golf tournament. Participants again attended several committee meetings, including the September 15, 2011 "Supplier and Manufacturers Committee." On the following day, September 16, 2011, the Gypsum Board Committee met. During the week-long conference, attendees discussed topics, including how "effective control systems are critical to maintaining margins," how "changes in quoting policies are affecting the way contractors bid and estimate jobs, and the way suppliers and distributors stock inventory," as well as "the reason for the

changes to quoting policies." As detailed below, just days after this conference, Lafarge and its co-conspirators began publicly announcing the coordinated price increases and changes in their job quotes policies.

88.     At the Global Gypsum Conference in Las Vegas in October 2011, Mr. Bob Bruce, owner of Innogyps, Inc., the leading gypsum market consulting entity in North America, acknowledged that the industry faced continued difficult economic conditions and explicitly warned that economic conditions did not support (non-collusive) price increases. Mr. Bruce stated: "The industry needs to achieve in the region of 85% capacity utilization to be able to push through price rises, rather than the 55% level that we are at right now." Similarly, Eagle Materials, the parent corporation of American Gypsum, estimated that capacity utilization needed to be approximately 90% in order for U.S. wallboard manufacturers to exercise pricing power unilaterally. Lafarge and its co-conspirators understood that any efforts by individual manufacturers to impose substantial price increases in this competitive environment would have been doomed to failure.

89.     Meetings involving the Drywall Finishing Council ("DWFC") provided another opportunity for Lafarge and/or its co-conspirators to communicate and to implement and maintain their scheme to fix wallboard prices. USG, National Gypsum, CertainTeed, Continental, and American Gypsum are members of DWFC and attend its annual convention each fall and its annual spring social event. DWFC events that conspirators attended and which provided an opportunity to collude and conspire include:

- DWFC 2011 Spring Meeting held on April 5, 2011 at the Embassy Suites Hotel in Las Vegas, Nevada;

- DWFC 2011 Fall Meeting held on September 20, 2011 at the Hampton Inn— Tropicana Hotel in Las Vegas, Nevada;

- DWFC 2012 Spring Meeting held on April 16, 2012 at the Holiday Inn in Charlotte, North Carolina; and

- DWFC 2012 Fall Meeting held on September 18, 2012 at the New York, New York Hotel in Las Vegas, Nevada.

90.     Similarly, Lafarge and its co-conspirators belong to a trade association known as the Drywall & Interior System Contractors Association, which provided yet another opportunity for Lafarge and its co-conspirators to collude.

91.     Through AWCI, Lafarge and its co-conspirators met again in subsequent years and had further opportunity to conspire. From September 11–14, 2012, Lafarge and its co-conspirators attended the AWCI Executive's Conference held at the Loews Miami Beach Hotel in Miami, Florida. From September 17–20, 2013, Lafarge and/or its co-conspirators attended the AWCI Executive's Conference held at the US Grant Hotel in San Diego, California.

92.     These numerous industry meetings, among others, provided opportunities for Lafarge and its co-conspirators to discuss otherwise confidential information, including the price of Drywall, elimination of competitive job quotes, restriction of Drywall supply, and implementation as well as maintenance of the conspiracy described herein. Upon information and belief, Lafarge and its co-conspirators did discuss confidential information, including the price of Drywall, elimination of competitive job quotes, restriction of Drywall supply, and implementation as well as maintenance of the conspiracy described herein at one or more of the aforementioned industry meetings.

3.     *Communications Through Industry Analysts*

22

93.     Lafarge and its co-conspirators also used industry analysts to communicate their pricing plans and adherence to the pricing conspiracy to one another in furtherance of the conspiracy.

94.     Research analysts regularly communicated information shared by one co-conspirator with other co-conspirators either directly (emailing notes about the analyst's interaction) or indirectly (quoting the co-conspirator in an analyst report and then circulating that report). For example, National Gypsum and Lafarge signaled their continued participation in the price-fixing conspiracy through communications with research analysts at Thompson Research Group ("TRG") and Longbow Communications ("Longbow"). Others, including PABCO, CertainTeed, and American Gypsum, also communicated and received updates and reports from Longbow Communications.

95.     Specifically, Craig Weisbruch, Senior Vice President of Sales and Marketing at National Gypsum, sent communications relating to pricing strategies to TRG and Longbow and excerpts of those communications appeared verbatim in reports circulated to Lafarge and its co-conspirators including but not limited to USG, TIN, and CertainTeed. Mr. Weisbruch knew that the competitive information he provided to the research analysts was being shared at the time he made those communications given that the analysts were also sharing other manufacturers' information with him. For example, analysts at Longbow told Mr. Weisbruch that National Gypsum's "smaller competitors [we]re telling Longbow that they are serious about this [price increase], and while they don't feel comfortable leading future increases, they are more than ready to follow them." Analysts also relayed to Mr. Weisbruch information regarding price increases and job quote elimination "just heard from [Mr. Weisbruch's] counterpart at PABCO."

96.     Likewise, Lafarge knew that the information it provided to Longbow would be

passed along, often verbatim. In December 2011, Steve DeMay, Vice President of Sales at Lafarge, communicated pricing strategy information to Longbow including in a 27 minute telephone call with Zoran Miling, an analyst at Longbow. Mr. Miling's notes from this call reflect Mr. DeMay's conveyance of confidential and detailed financial and pricing information to Mr. Miling, including a fear that USG could destroy the price increase and anticipation of a collective response from National Gypsum, Lafarge, and CertainTeed if USG did move. Additionally, Mr. Miling's notes describe the price increase as capable of being "undermined" in several instances, confirming the existence of an agreement to fix Drywall prices. Portions of Mr. Miling's notes from this December 2011 call were subsequently included in a Longbow report that was circulated to other co-conspirators including but not limited to USG. Mr. DeMay also knew that the competitive information he provided to the research analysts was being shared at the time he made those communications given that Longbow had directly quoted Lafarge in its past reports. Mr. DeMay even explicitly acknowledged this sharing of information stating, "If I could talk to my counterparts at other manufactures [sic] I would tell them . . . ."

4.    *Further Evidence of an Agreement*

97.    Various communications evidence an agreement between Lafarge and its co-conspirators.

98.    On April 27, 2011, Keith Metcalf (Sr. VP of Marketing, Sales, and Distribution, American Gypsum) sent internal email stating: "Please don't quote anything in 2012. We may have a movement from all manufacturers to eliminate quotes."

99.    On September 2, 2011, Mr. Metcalf sent an internal email prohibiting staff from providing job quotes except in limited circumstances, writing: "[s]ome of this may sound odd but if you would like to discuss further please give me a call."

100.    Around December 7, 2011, Mr. DeMay's commented to Longbow that if USG raised its prices there would be a "collective responds [sic] from all of us – National, Lafarge, CertainTeed – we all respond. . . . If I could talk to my counterparts at the other manufactures [sic], I would tell them that the table is set and that we must show a degree of fortitude that we have not shown in years."

101.    Around June 14, 2012, Craig Weisbruch (Sr. VP Sales and Marketing, National Gypsum) informed TRG that there were "verbal agreements" for price increases for 2013, as reflected in notes from a phone call with Mr. Weisbruch,

102.    In a Lafarge report from October 2012, Mr. DeMay reported internally regarding a "price increase and agreement not to move pricing lower."

103.    The existence of an agreement is also evidenced by the fact that Lafarge and its co-conspirators frequently anticipated specific actions by their supposed "competitors," suggesting advance knowledge of confidential business plans.

104.    For example, upon receiving American Gypsum's price increase announcement in 2011, a CertainTeed Regional Manager wrote, "Here it is. USG probably will be next." Similarly, when PABCO's Ryan Lucchetti received a copy of this same price increase announcement, his internal correspondence suggests that he expected the increase and further expected additional increases to follow.

**B.    Fall 2011 Collusive Price Increases**

105.    Between the AWCI meeting in Coeur d'Alene in September 2011 and the Gypsum Association trade meeting in Las Vegas, Nevada in October 2011, Lafarge and its co-conspirators sent letters to their domestic customers uniformly announcing that their Drywall prices would increase by an unprecedented 35% in January 2012, an inexplicable rise in the face

of such weak demand. They also announced that—unlike historical pricing, which fluctuated multiple times per year—these price increases would remain in place throughout 2012.

106.    Each announcement contained notably similar language:

- On September 20, 2011, American Gypsum stated, "Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products. This increased price (up 35%) will be your price for the entire year 2012. This increase applies to all segments of the business."

- On September 28, 2011, USG stated that "new pricing . . . will be effective on all wallboard purchases beginning January 1, 2012."

- On September 30, 2011, National Gypsum stated "National Gypsum Company will implement a price increase of 35% on all wallboard products, to be effective on January 1, 2012. It is our intention that the resultant price (up 35%) will apply for all 2012."

- On October 3, 2011, CertainTeed stated that customers would receive a new price schedule on November 15 for "all wallboard products." CertainTeed later stated that "our price increase, intended to be in effect for the calendar 2012 year, will range between 35% and 37% for all gypsum wallboard products." This letter was erroneously dated October 3, 2012, although the body of the letter makes clear that it was actually issued on October 3, 2011.

- On October 4, 2011, Defendant Lafarge stated "on Monday, January 2nd 2012 we will implement a 35% increase on all our wallboard products." Tellingly, this letter contained an error identical to the one committed by CertainTeed: it was also mistakenly dated October 4, 2012, although the body of the letter makes clear that it was actually issued on October 4, 2011. The fact that Lafarge made the same dating mistake as CertainTeed strongly suggests that Lafarge's letter was copied from CertainTeed's, or that both were copied from the same source.

- On October 12, 2011, PABCO stated "Effective January 1, 2012, PABCO will implement a 35% price increase across all product lines. This increase will establish pricing for the calendar year 2012."

107.    Defendant Temple-Inland announced similar substantial price increases, effective for all of 2012, around this time.

108.    By January 1, 2012, American Gypsum, USG, National Gypsum, CertainTeed, Lafarge, and PABCO had formally announced the elimination of job quotes and a shift to

26

calendar-year pricing. All except USG had formally announced a price increase amount of approximately 35%.

| Manufacturer | Initial Price Bulletin | % Increase Ultimately Announced | Job Quote Elimination |
|---|---|---|---|
| American | 9/20/2011 | 35% | Yes |
| USG | 9/28/2011 | Less than 30%* | Yes |
| National | 9/30/2011 | 35% | Yes |
| CertainTeed | 10/3/2011 | 35-37%* | Yes |
| Lafarge | 10/4/2011 | 35% | Yes |
| PABCO | 10/12/2011 | 35% | Yes |
| TIN | 11/29/2011 | 35% | Not in letter, but eliminated in practice |

*percentage price increase announced after initial letter

109.    The price increase "stuck" because Lafarge and its co-conspirators, sharing confidential information, policed the conspiracy and did not undercut one another. Mr. Weisbruch (National Gypsum) bragged to TRG about the unprecedented price increases that it was able to obtain from Home Depot because none of the manufacturers "backed down."

110.    Throughout 2012, purchasers of Drywall paid substantially higher prices than they did in previous years. Indeed, Lafarge and its co-conspirators' control of the market was so vast that even non-conspirators were able to increase prices without fear of competition. In short, in 2012, there was a large and historically unprecedented increase in the price paid for Drywall. Unlike previous years, no manufacturer retracted its price increase, and the ability of customers to make Lafarge and its co-conspirators compete against each other on price had been virtually eliminated. Rather, as an industry analyst reported in 2012, the price increase "continues to hold nearly in full."

111.    This price increase reflected a historically unprecedented means both of pricing

27

Drywall and of announcing price increases. It is implausible that Lafarge and its co-conspirators each independently decided to implement this wholly new practice to the industry.

112.    Moreover, this new strategy was inconsistent with independent decision-making and with sound business practice. If any manufacturer had attempted to implement these changes independently, it would have suffered the predictable consequences of failing to price competitively, *i.e.*, losing customers, market share, and revenue.

113.    Many aspects of this increase were unusual and cannot be explained by a manufacturer acting in its rational self-interest absent collusion.

114.    First, the 35% price increase for Drywall was the single largest increase ever for Drywall. And, it was the only such increase ever attempted in a market with such weak demand and severe overcapacity. In the face of declining demand and thriving, price-based competition, no rational manufacturer would take the risk of implementing such a price change absent assurance that its competitors intended to implement similar increases. This is because each manufacturer was aware that, by doing so, it would suffer both a short- and long-term loss of business and market share. Indeed, lone actors prior to fall of 2011 suffered just these consequences, forcing them to reduce their prices to competitive levels.

115.    Second, Lafarge and its co-conspirators indicated that they would implement their price increases on virtually the same date, either January 1 or January 2, 2012. Previously, these manufacturers typically announced their own price changes with disparate effective dates scattered throughout the calendar year. They did so in order to take advantage of (or escape the consequences of) unpredictable fluctuations in input prices, demand, and other factors. It is implausible that these factors led each manufacturer to decide independently to implement a price increase at precisely the same time as each other manufacturer, particularly in light of the

historically unprecedented nature and size of the increase.

116.    Third, Lafarge's and its co-conspirators' announcements indicate the price increases were to be effective for the entirety of 2012. Previously, many manufacturers had changed prices more frequently than on an annual basis, typically on a quarterly basis. For example, in the first eight months of 2008, there were four announced price changes by Drywall manufacturers. Such a practice made sense from a business perspective, as frequent price changes allowed manufacturers to respond effectively to fluctuations in input prices, demand, and other factors. No manufacturer would abandon this competitive practice without knowledge that its competitors would do the same.

117.    Fourth, Lafarge and its co-conspirators made the fall 2011 price announcements far in advance of their effective date—another change from prior practice. Historically, price increase announcements were made 30−45 days in advance of their effective date. This enabled manufacturers to correlate their pricing to the input costs, demand, and competitive conditions in place on the effective date of the increase and ensured pricing was as competitive as possible in light of underlying costs. No manufacturer would give up this competitive advantage absent knowledge others would do the same. Indeed, the most plausible explanation for this change is that the conspirators intended to signal their adherence to a pricing agreement.

118.    Fifth, American Gypsum—the conspirator with one of the smallest market shares—sent the first of the price increase letters. This was a change from historical practice where competitors with larger market share (such as USG or National Gypsum) drove the price increases. It is implausible that American Gypsum, a relatively small player in the Drywall market, would have taken the risk of increasing prices and eliminating job quotes without assurance that its competitors would follow suit.

119.   Sixth, the price increases announced in the fall of 2011 were largely implemented when specified and maintained materially throughout the year, whereas earlier price increases were frequently modified after announcement. For example, some Drywall manufacturers announced price changes effective in November 2010, but then subsequently delayed those increases and rolled them out in two installments: one in March 2011 and one in May 2011. The fact that there were no subsequent changes to the price increases announced in 2011 further suggests coordination.

120.   Seventh, the large increase in Drywall prices was not in response to, or in expectation of, increased demand. The reality was the opposite: industry analysts warned investors that in 2012 "demand for drywall would be no better this year than last." Likewise, National Gypsum stated that the level of Drywall quantities purchased "has essentially been flat and at historically low levels" and projected that the "outlook for the next 12 to 18 months might at best be described as a slow 'climb out.'" CertainTeed projected in October 2011 that "[t]he housing market is still anemic with little expectation of real improvement in the coming year." Similarly, in October 2011, USG stated that it believed that the market is "going to be flat next year." Such reduced or stable demand economically suggests reduced or stable pricing; the fact that Lafarge and its co-conspirators successfully raised prices in the face of these conditions suggests collusion.

121.   Indeed, before the fall 2011 announcement of the collusive price increase, Drywall prices had been falling for three straight months: down 0.6% in July 2011, 1.7% in August 2011, and 1.7% in September 2011. Lafarge and its co-conspirators anticipated the soft market for their products to continue but, nevertheless, announced large increases in Drywall prices. In other words, these increases were not related to a rise in demand. Economic factors

could not support the price increases, and thus the only plausible explanation for the sudden upward surge is conspiratorial conduct.

122.    Eighth, there was no increase in production or selling costs that would explain the large price increase. Indeed, average wholesale natural gas prices, which Drywall prices are highly sensitive to, fell significantly in 2012. Moreover, as alleged above, most of the Drywall manufacturers are vertically integrated. Consequently, they could and did exert control over the other major component costs that go into Drywall, components such as gypsum and paper.

123.    Ninth, Lafarge and its co-conspirators announced and then imposed their price increases when the industry was experiencing extensive overcapacity or low capacity utilization. Lafarge reported industry capacity utilization at less than 50% as of September 30, 2011 when the initial price increases were announced. Similarly, as of November 21, 2011, Longbow reported that capacity utilization remained at 50%. This overcapacity resulted largely from the decline in construction caused by the financial crisis. It is well-known in the industry that the existence of overcapacity typically drives prices down, yet Lafarge and its co-conspirators increased prices notwithstanding these conditions.

124.    Tenth, Lafarge and its co-conspirators timed the effective date of the price increase at the beginning of January, a time when customers otherwise had maximum flexibility because they had just received their volume rebates for the previous year and could switch to purchasing from another supplier without undercutting the volume of purchases required to maximize their rebate for the calendar year. If any individual conspirator were going to attempt such a large price increase, absent collusion, it would not do so when it was easiest for customers to switch to another manufacturer's product.

125.    Despite all of the factors described above, Lafarge and its co-conspirators

increased prices for Drywall without fear that their customers could turn to competitors who were selling at a lower price, because those competitors had agreed not to sell at a lower price. Without such conspiratorial conduct, Drywall prices should have remained relatively stable in light of costs and market expectations. The fact that prices rose substantially for all Drywall manufacturers in 2012, despite competitive conditions dictating stable prices, indicates collusive behavior.

126.    In the absence of collusion, the independent self-interest of each manufacturer would have led it to keep its prices relatively stable to capture increased sales to customers dissatisfied with a competitor's price increases. Simply put, any one manufacturer, or even a small subset of manufacturers, could not have maintained sharp price increases given market conditions, for it would have lost revenues when customers responded by purchasing Drywall from companies which did not sharply increase prices. Consequently, only collective action enabled Lafarge and its co-conspirators to jointly impose price increases.

### C.    Collusive Elimination of Job Quotes

127.    Alongside their price increases, and through the same announcement letters, Lafarge and its co-conspirators declared that they were immediately eliminating job quotes. This was another dramatic and simultaneous change from prior practice and was done to further ensure that the January 1, 2012 increase would be effective.

128.    Job quotes (or "price protection") had been a standard feature of the Drywall industry for decades. The practice guaranteed customers a set price (or an initial price with a series of specified adjustments) for Drywall for a construction project that might take months or years to complete. Specifically, manufacturers provided job quotes to a supply yard or distributor delineating a specific volume, tied to a product, and a job, for a specific period.

129.    Lafarge and its co-conspirators sharply altered the competitive landscape in the industry in the fall of 2011 by abolishing this longstanding pricing practice. Prior to 2011, job quotes governed the prices for a quantity varying between 30−70% of Drywall sold in the United States.

130.    The coordinated elimination of job quotes constituted another form of price-fixing by Lafarge and its co-conspirators. Prices set forth in job quotes were almost always discounted. Consequently, by eliminating the practice of job quotes, Lafarge and its co-conspirators were eliminating an important component of price competition.

131.    The elimination of job quotes also made it harder for customers to circumvent future price increases. In other words, customers could not "lock in" prices for long-term projects by soliciting and receiving competitive job quotes prior to the price increases' effective dates. The elimination of job quotes therefore improved the effectiveness of the conspiracy.

132.    The elimination of job quotes also improved Lafarge and its co-conspirators' ability to monitor the cartel, and thus enforce the conspiracy. Previously, the use of job quotes made it difficult for a competitor to monitor the prices charged by rivals in the industry. Had job quote pricing remained in place, it would have been harder for one cartel member to determine whether a low price given to a particular customer by another cartel member was pursuant to a job quote or was instead "cheating" on the cartel price. By eliminating job quotes collectively, Lafarge and its co-conspirators ensured that they could easily, accurately, and comprehensively observe each other's prices.

133.    Job quotes, which were typically requested by customers, were a tool customers used to negotiate against Lafarge and its co-conspirators. For example, if two competitors were competing for a particular project, a customer would seek a job quote from each as a means of

33

distinguishing the two. Lafarge and its co-conspirators' collective abandonment of this practice removed competitive discipline from the Drywall market.

134.    The agreement to eliminate job quotes directly contributed to the increased prices effective in 2012 and 2013. Combining the abolition of job quotes with price increases maintained throughout the calendar year allowed Lafarge and its co-conspirators to achieve much higher prices for Drywall in 2012 and 2013 than in preceding years.

135.    The announcements abolishing job quotes, like the announcements regarding price increases, bear similarities indicative of collusion (all emphasis added):

- "Our past job quote policy is no longer appropriate as we seek to improve the consistency and administrative efficiency of our pricing policies. In light of the changing market, *USG will no longer offer job quotes and/or price protection on wallboard, effective immediately*." (USG letter, September 28, 2011)

- "The practice of providing job quotes is broken and counterproductive to meaningful and consistent price management needed to support profitability. Therefore*, effective immediately, we will discontinue for all product lines the policy of providing job quotes*." (National Gypsum letter, September 30, 2011).

- "In review of our business practices and policies for bringing products to market, we have noted a significant increase in the amount of job quote requests and find the process to be inefficient and administratively burdensome. Accordingly *we find it necessary to cease all job quotes immediately*." (CertainTeed letter, October 3, 2011, bearing the erroneous issue date of October 3, 2012).

- "*Effective immediately, we will no longer be providing job quotes*." (American Gypsum Letter, September 20, 2011).

- "*[E]ffective immediately, we will cease all job quotations*." (Lafarge Letter, October 4, 2011, bearing the erroneous issue date of October 4, 2012).

- "*Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes*." (PABCO Letter, October 12, 2011).

136.    Each of the remaining Drywall manufacturers communicated to its customers at or near this time that it was abolishing job quotes effective immediately. Unilaterally abolishing

job quotes contravened the self-interest of any one manufacturer. Any independent manufacturer singly discontinuing the practice of making job quotes available would have triggered an extremely hostile customer reaction, leading to plummeting revenues and lost profits as customers flocked to competitors offering job quotes.

137.    In short, no one conspirator held the market power to eliminate the practice of providing job quotes by itself. Only by colluding could the manufacturers eliminate the practice to further suppress competition.

138.    Lafarge and its co-conspirators timed the elimination to further their efforts to negotiate and implement their conspiracy. In the letters quoted above, these manufacturers announced that they were eliminating the practice of providing job quotes immediately, but not implementing the price increases until months later. Consequently, each manufacturer had the opportunity to prove its "good faith" commitment to the anticompetitive scheme by immediately implementing the elimination of job quotes. If a manufacturer had backed out of the scheme by failing to publicly announce their elimination of job quotes, then any other co-conspirator would know that the scheme had collapsed before implementing its own price increase the following January. That manufacturer could then back away from its price increase long before actually assessing it against customers and thereby avoid the risk of losing the patronage of those customers to other manufacturers who did not comply with the scheme.

139.    The timing of the announcements concerning job quotes also confirms the existence of the conspiracy in another way. Traditionally in the Drywall industry, the quantity of Drywall sold declines in winter as construction activity softens. Consequently, prices frequently change in February, as purchases accelerate in anticipation of increased construction volume in the spring. As a result, autumn has historically been the time of greatest demand for job quotes,

35

as purchasers wish to lock in a price for a project that will extend beyond the February price fluctuations. Absent collusion, no individual Drywall manufacturer would have an independent interest in declining to provide job quotes at the time when demand for those job quotes is highest, because customers in that event would likely switch to competing manufacturers who continued the historical practice of providing job quotes.

140.    Lafarge and its co-conspirators reaffirmed their refusal to offer job quotes after the initial announcements in the fall of 2011. On September 6, 2012, National Gypsum stated that "our elimination of the practice of providing job quotes remains in effect and is strictly enforced." Similarly, CertainTeed stated on September 13, 2012, that it "continues our policy of not providing price quotes to customers for specific projects." The other co-conspirators also continued to refuse to provide job quotes. The elimination of job quotes perniciously harmed competition, as alleged herein.

141.    Moreover, because of their overwhelming market power, Lafarge and its co-conspirators' refusal to offer job quotes has reduced the ability of customers to demand job quotes, even when that customer is dealing with a non-conspiring manufacturer, because customers can no longer plausibly threaten to seek job quotes from another market participant.

### D.    Fall 2011 Supply Restrictions

142.    Prior to the fall of 2011, price increases announced by Lafarge and its co-conspirators did not involve supply restrictions. Accordingly, many customers would respond by buying increased quantities of Drywall in the interval between the announcement of the price increase and the effective date of the increase to "stockpile" for the upcoming year. This practice helped customers avoid price increases. Further, this increase in Drywall purchases in the interval resulted in reductions of the amount demanded for Drywall shortly after the effective

date, a consequence making it more difficult for manufacturers to maintain the price increase. As a result, manufacturers sometimes announced price increases that they knew they could not maintain in the long run in order to boost sales during the interval for cash flow reasons.

143.    By contrast, when Lafarge and its co-conspirators announced price increases and abolished job quotes in the fall of 2011, they also implemented supply restrictions. Around September 2011, USG, National Gypsum, American Gypsum, PABCO, and CertainTeed prohibited purchasers from buying a greater quantity of Drywall than they had bought in comparable periods earlier in the year. And, the Lafarge sales force was instructed to tell customers that it was prepared to idle capacity and even shut down plants if needed to support the industry price increase.

144.    To enforce the supply restrictions, Lafarge and its co-conspirators monitored purchasers to prevent them from increasing inventory in an effort to evade the price increases. Lafarge and its co-conspirators also notified each other, as a part of their concerted action, when a particular customer held out the prospect of building up inventory excessively. They then notified such customers, typically distributors, that they had begun monitoring their purchases.

145.    With respect to the announcement in 2012 of price increases to take effect in 2013, further discussed below, one analyst noted that "most distributors were reminded of their limited ability to procure product ahead of last year's price increase, which was driven in large part by controlled distribution and manufacturers rather uniformly taking down their plants for maintenance in mid to late December, which severely limited distributors' ability to procure product at that time." The analyst went on to state that, around mid-September 2012, "manufacturers implemented a national allocation program," restricting distributors' ability to place new orders to their average quantities purchased over the last one or two quarters.

146.     Lafarge and its co-conspirators imposed these supply restrictions in the face of an excessively large amount of unused capacity, as alleged above. Indeed, USG recognized in 2012 that capacity utilization was still at a "historically low" level.

147.     Restricting supply goes against the independent interests of any individual manufacturer, especially in light of the overcapacity in the industry. If an individual manufacturer in a truly competitive market attempted to restrict the amount of purchases by a given buyer, the buyer would have solicited competing manufacturers, who would have been eager to employ their unused capacity to fill such orders. Consequently, a Drywall manufacturer restricting supply independently would almost certainly lose the specific order and would likely lose the customer permanently (by causing the customer to buy from another manufacturer who was not imposing such restrictions). By acting collusively rather than independently, Lafarge and its co-conspirators successfully imposed both sharp price increases and supply restrictions, each secure in the knowledge that its co-conspirators would not win over disaffected customers.

**E.     Fall 2012 Collusive Price Increase Announcements**

148.     Consistent with their earlier signals, Lafarge and its co-conspirators announced a second simultaneous and unjustifiable price increase in August and September 2012. Similar to the previous increase, each manufacturer's increase took effect on January 1, 2013 and remained in place for the entire year.

149.     Specifically:

- American Gypsum stated on August 22, 2012 that it would impose an additional 25% price increase on all gypsum board products on January 1, 2013, applying throughout 2013.

- National Gypsum stated on September 6, 2012, that it "will increase prices on its entire Gypsum Wallboard product line . . . by 30% across the board. It is once again, our intention that this increase will be good for the entire calendar

year of 2013. In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced."

- CertainTeed stated on September 13, 2012, that it "will increase price effective with shipments on January 2, 2013 by 30%. This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year." CertainTeed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- Defendant Lafarge stated on October 15, 2012 that effective January 1, 2013, prices of all wallboard products would increase by 30% and "[t]his price increase applies to all our gypsum board products and is intended to be in effect for all of 2013."

- PABCO stated on October 24, 2012 that "[e]ffective January 1, 2013, PABCO Gypsum will implement a 30% price increase across all product lines. This increase will establish pricing for the Calendar Year 2013."

- USG stated on November 16, 2012 that, effective January 1, 2013, that "USG will not provide job quotes or price protection for any wallboard products," and that price increases on the order of 30% would be imposed on customers "in effect for all of 2013."

- Temple-Inland stated on November 26, 2012, for all customers that Temple-Inland "will be increasing the price 30% on all gypsum wallboard products" effective December 30, 2012.

150. Lafarge and its co-conspirators imposed this second round of sharp price increases even though excess capacity remained a persistent feature of the market. No single manufacturer, acting independently, could hope to adhere to such high prices because competitors would employ excess capacity to increase supply, undercutting such a sharp price increase.

151. As USG stated in April 2012:

[T]here is significant excess wallboard production capacity industry-wide in the United States. Industry capacity in the United States was approximately 31.9 billion square feet as of January 1, 2012. We estimate that the industry capacity utilization was approximately 54% during the first quarter of 2012 compared to 51% during the first quarter of 2011 and 56% during the fourth quarter of 2011. We project that the industry capacity utilization rate will remain at approximately the current level for the balance of 2012.

152.    Further, USG acknowledged that "such a low level of capacity utilization" puts "pressure on gypsum wallboard selling prices and gross margins."

153.    Like with the price increases for 2012, the 2013 price increases also stuck because Lafarge and its co-conspirators policed the conspiracy, did not undercut one another, and continued to prohibit job quotes.

154.    For example, after receiving the price increase letters referenced above, Home Depot approached Drywall manufacturers and said any one of them could gain a considerable volume of sales if they simply held their 2012 price throughout 2013, but they uniformly refused. As Mr. Weisbruch described it to Longbow, Home Depot came to National Gypsum and other suppliers saying Home Depot would do anything if they didn't raise prices, but no one was interested.

155.    Lafarge and its co-conspirators also enabled these subsequent price increases by maintaining the supply restrictions implemented in fall 2011. USG, National Gypsum, American Gypsum, Temple-Inland, Lafarge, and CertainTeed each announced their intent to restrict purchase volume for fall 2012. For example, around September 18, 2012, USG stated that it had "put in a controlled distribution policy for our customers" and, consequently, customers "know there's a ceiling on what they can purchase."

156.    The price increases from 2012 to 2013 resulted in even higher supra-competitive prices than had been in place in 2012.

**ANTITRUST INJURY AND IMPACT**

157.    Lafarge and its co-conspirators' unlawful agreement and conspiracy has had the following effects, among others:

    (a)      Restraining or eliminating price competition with respect to Drywall; and

    (b)      Raising, fixing, stabilizing and maintaining prices for Drywall at artificially inflated levels; and

    (c)      Depriving purchasers of Drywall from the benefit of free and open competition in the Drywall market.

158.    During the Conspiracy Period, Home Depot paid supra-competitive prices for Drywall.

159.    Because of the alleged violations of the antitrust laws, Home Depot has sustained injury to its business or property, having paid higher prices for Drywall than it would have paid in the absence of Lafarge and its co-conspirators' illegal contract, combination, or conspiracy, and, as a result, has suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## TOLLING OF STATUTE OF LIMITATIONS

160.    As a result of the filing of class actions relating to Lafarge and its co-conspirators' illegal conspiracy to fix the prices of Drywall, the statute of limitations relevant to Home Depot's purchases of Drywall has been tolled under *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("*American Pipe*").

161.    Specifically, the statute of limitations applicable to claims for direct purchases of price-fixed Drywall was tolled as a result of the filing, at least as early as December 20, 2012, of certain direct purchaser class action complaints against Lafarge and its co-conspirators.  Those complaints included Home Depot in the class definitions and asserted claims against Lafarge and its co-conspirators for their participation in the illegal price-fixing conspiracy under the Sherman

Act.

162.    Namely, a putative class of direct purchaser plaintiffs filed suit on December 20,

2012 against CertainTeed Corp., USG Corporation, United States Gypsum Company, New NGC,

Inc., Lafarge North America Inc., Georgia-Pacific LLC, American Gypsum Company LLC, TIN

Inc. d/b/a Temple-Inland Inc., PABCO Building Products, LLC, in United States District Court

for the Eastern District of Pennsylvania alleging violations of Section 1 of the Sherman Act. This

case and numerous cases thereafter were transferred to a Multi-District Litigation in the Eastern

District of Pennsylvania which is currently pending as MDL 2437.

163.    On August 23, 2017, the Eastern District of Pennsylvania certified the following

direct purchaser litigation class in MDL 2437:

> All persons or entities that purchase gypsum board in the United States directly
> from any of the Defendants, their subsidiaries, affiliates or joint-ventures from
> January 1, 2012 through present (the "Class Period"). Excluded from the Class
> are Defendants, their parent companies, subsidiaries and affiliates, and any co-
> conspirators, federal governmental entities and instrumentalities of the federal
> government.

164.    On June 16, 2016, Lafarge settled with the direct purchaser plaintiffs for

$23,000,000. On October 16, 2016, Home Depot timely submitted its letter of exclusion to opt

out of the Lafarge settlement class.

165.    The statute of limitations relevant to Home Depot's claims was equitably tolled by

the doctrine of fraudulent concealment until the first putative class action was filed.

166.    Home Depot's claims have further been tolled by the doctrine of equitable tolling.

## **VIOLATIONS ALLEGED**

### **Claim for Relief**

### **(Violation of Sherman Act)**

167.    Home Depot incorporates and realleges, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

168.    Beginning at least as early as September 2011 and continuing through at least the end of 2013, the exact dates being unknown to Home Depot, Lafarge and its co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, and maintain prices in the market for Drywall in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

169.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Lafarge and its co-conspirators did those things that they combined and conspired to do, including but not limited to, the following acts and practices: (1) fix, raise, maintain and stabilize the price of Drywall; and (2) allocate markets for Drywall among themselves.

170.    Home Depot has been injured in its business and property by being forced to pay more for Drywall manufactured by Lafarge and its co-conspirators and others than it would have paid in the absence of Lafarge and its co-conspirators' price-fixing conspiracy.

## **PRAYER**

WHEREFORE, Home Depot prays:

A.        That the unlawful agreement, conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed to be a restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the Claim for Relief;

B.        That Home Depot recovers damages and/or other monetary relief, as provided by federal antitrust laws, and that judgment be entered in favor of Home Depot against Lafarge in an amount to be trebled in accordance with such laws;

C.        That Home Depot be awarded pre-and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

D.       That Home Depot recovers its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and

E.       That Home Depot be awarded such other further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Home Depot demands a jury trial.

Dated: June 11, 2018                    BRYAN CAVE LEIGHTON PAISNER LLP


                                        By:____/s/ G. Patrick Watson_____
                                             G. Patrick Watson
                                             Lindsay S. Johnson
                                             Sakinah N. Jones


                                             Attorneys for Plaintiff

                                             HOME DEPOT U.S.A., INC.