**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF**
**PENNSYLVANIA**

| | |
|---|---|
| IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION | CIVIL ACTION |
| | MDL 2437 |
| HOME DEPOT U.S.A., INC., | NO. 18-5305 |
| v. | |
| LAFARGE NORTH AMERICA INC. | |

**MEMORANDUM RE: DEFENDANT'S MOTIONS TO EXCLUDE TESTIMONY OF**
**DR. KNEUPER AND DR. MCCLAVE**

Baylson, J.                                                                            August 20, 2021

The issue presented is whether, in this antitrust case, the Plaintiff, Home Depot, can present opinions by an economist that:

1. Ignore relevant facts and prior decisions in the same case.

2. Ignore the benefits Home Depot received, as a member of a settlement class, as it proceeds as an "opt out" against one Defendant, Lafarge.

## I.   INTRODUCTION

In fall 2011, several U.S. drywall manufacturers announced substantial changes to their pricing, ending long-standing pricing practices and arranging for a very large price increase to take place in January 2012 and to be effective for the entire year. (Compl. 25–26 ¶¶ 105–06, ECF 1.) Then, in fall 2012, these manufacturers again announced similar price increases to take effect in January 2013. (Id. at 38–39, ¶¶ 148–49.)

This litigation started with class action complaints filed in several district courts which

were consolidated in this Court for pretrial proceedings under 28 U.S.C. § 1407. The extensive history of these proceedings is reviewed below because it is highly relevant to the issues presented as to Home Depot's economic expert.

Home Depot was a putative member of the alleged class of direct purchasers who sued drywall manufacturer defendants.[1] As the procedural history, infra at 3, shows, there were two separate class settlements. Home Depot did not opt out of the first settlement, but did opt out of the second class settlement, but only as to a single defendant, Lafarge, on October 16, 2016.[2] Home Depot subsequently filed this lawsuit against Lafarge in the Northern District of Georgia on June 11, 2018. The case was then transferred by the Judicial Panel of Multidistrict Litigation ("JPML") to continue as part of the ongoing pretrial proceedings in this Court, over Home Depot's objection, on December 10, 2018. The JPML stated

> [W]e conclude that this action shares questions of fact with the actions transferred to MDL No. 2437 and that transfer . . . will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.
>
> * * *
>
> The transferee judge has overseen substantial pretrial proceedings concerning the alleged conspiracy in MDL No. 2437 since 2013, including significant rulings on dispositive motions and discovery disputes. Thus, he remains in the best position to streamline discovery and motions practice in the new action in light of the discovery and motions practice that have been completed. He also can ensure the just and efficient resolution of common motions concerning defendant Lafarge, the alleged coconspirators, and other nonparties with relevant information.

---

[1] See In re Domestic Drywall Antitrust Litig., MDL No. 13-2437, 2020 WL 1695434, *1 (E.D. Pa. Apr. 7, 2020) (Baylson, J.).

[2] Home Depot submitted its letter of exclusion on October 16, 2016 (Compl. 42 ¶ 164), and final judgment was entered, with Home Depot listed as an opt-out party, as to Lafarge only, on December 7, 2016. (ECF 503, Dkt. No. 13-MD-2437.)

Transfer Order 1–2, ECF 15.

Home Depot's opt-out complaint against Lafarge includes very similar allegations as those contained in the class action complaint against the drywall manufacturers. Those allegations were previously the subject of the second class-wide settlement for over $200 million, which this Court approved.

Turning to the present opt-out case between Home Depot and Lafarge, Lafarge's Motion to Exclude the Proposed Expert Testimony of Dr. Kneuper, (ECF 83), will be granted, in substantial part, because Dr. Kneuper has crossed the line from economist to attorney–juror–judge. Dr. Kneuper's opinion, as well as the arguments of Home Depot's counsel, lack a fundamental acknowledgement of the important procedural history, underlying and undisputed facts, events, and rulings in this case.

## II.   <u>PROCEDURAL HISTORY</u>

Summarized briefly, Home Depot, purportedly the world's largest purchaser and reseller of drywall, participated in the direct-purchaser settlement class which was based upon this Court having made a number of rulings—some of which favored plaintiffs and some of which favored defendants. Of utmost importance here:

1. Plaintiffs never sued Georgia-Pacific;

2. This Court granted summary judgment in favor CertainTeed; and

3. USG (and its subsidiaries USG Corp. and L&W) settled with the direct-action plaintiffs before this Court certified a direct purchaser class.[3]

Despite these very relevant events in this same litigation, as detailed below, Dr. Kneuper

---

[3] Although the Court does not know the exact amount of money which Home Depot received from this settlement, that is not an important fact at this time.

has made conclusions about these three entities—CertainTeed, USG, and Georgia Pacific—that are contrary to undisputed facts and specific legal conclusions reached by this Court.

This Court has not found any case with a similar procedural history where a plaintiff, which participated in a class action settlement, subsequently seeks to bring a lawsuit against the one defendant as to which it opted out, but the plaintiff basically ignores relevant facts under which it received a substantial portion of the settlement funds.

### a. Multidistrict Litigation Background: The Initial Consolidation of Drywall Cases

In April 2013, the JPML ordered consolidation before the undersigned of various drywall antitrust cases from this and other districts for pretrial proceedings. Actions had been filed on behalf of proposed classes of Plaintiffs who purchased drywall either directly or indirectly from Defendants. (Transfer Order, ECF 15, Dkt. No. 18-5305.) The original Defendants were the following domestic drywall manufacturers:

- CertainTeed Gypsum ("CertainTeed"),
- United States Gypsum Company ("USG") and its parent USG Corporation ("USG Corp."),
- New NGC, Inc. ("National"),
- LaFarge North America Inc. ("LaFarge"),
- American Gypsum Company LLC ("American") and its parent company Eagle Materials Inc. ("Eagle"),
- TIN, Inc. ("TIN"), and
- PABCO Building Products, LLC ("PABCO").

Georgia-Pacific, another drywall manufacturer, was not a party in any of the consolidated cases. See In re Domestic Drywall Antitrust Litig., 163 F. Supp. 175, 195 n.15 (E.D. Pa. 2016) (Baylson, J.).

After Defendants' counsel indicated they would not file Rule 12 motions, the parties engaged in extensive discovery, including the exchange of voluminous document productions and depositions.  Id. at 180.  Plaintiffs (both direct and indirect purchasers of drywall)  proceeded

together through the summary judgment stage. On August 23, 2017, this Court granted the Direct Purchasers' Motion for Class Certification. (ECF 630, 13-MD-2437.)

Although the Court initially denied a Motion to Certify a class of indirect purchasers, the parties then revised the indirect purchaser class definition, and that class was certified for settlement purposes on June 6, 2018. (ECF 743, 13-MD-2437.)

**b.   <u>Initial Class Settlements</u>**

The first settlement in these cases was between the plaintiffs and "USG Defendants." (<u>See</u> Mem. Op., ECF 273, Dkt. No. 13-MD-2437.)   "USG Defendants" include USG Corp., a holding company with the subsidiaries United States Gypsum and L&W Supply Corporation. They reached these settlements before any Rule 56 Motions were filed or decided.  Home Depot was included as a direct purchaser in this USG settlement.   This Court granted preliminary approval of the settlements on March 16, 2015 (ECF Nos. 183-186, Dkt. No. 13-MD- 2437), and granted final approval and issued a final judgment order on August 20, 2015. (ECF Nos. 276-279, Dkt. No. 13-MD-2437). <u>See</u> <u>In re Domestic Drywall Antitrust Litig.</u>, 163 F. Supp. at 184.

**c.   <u>Summary Judgment Decision</u>**

The non-settling class action Defendants (American, National, Lafarge, PABCO, and CertainTeed) filed Motions for Summary Judgment. (ECF No. 204-207, Dkt. No 13-MD-2437.) <u>See</u> <u>id.</u>  This Court ruled on the motions in a lengthy opinion filed on February 18, 2016, granting summary judgment in favor of CertainTeed, but denying summary judgment as to National, American, PABCO, and Lafarge. In the opinion, the Court made important rulings and observations about the various Defendants' role in the alleged conspiracy, and concluded that, except for CertainTeed, there was sufficient evidence for the jury to conclude they had reached agreements in violation of the antitrust laws.  <u>See</u> <u>id.</u> at 257–60.

### i. As to Lafarge:

The Court denied Lafarge's Motion for Summary Judgment.  <u>Id.</u> at 260.  Every Lafarge employee Plaintiffs deposed had denied under oath that there was ever any discussion or agreement among Defendants regarding pricing or job quotes.  <u>Id.</u> at 187.  Some evidence in the record showed communications between Stephen DeMay (VP Sales, Lafarge) and a third-party analyst at Longbow.  <u>Id.</u> at 187.  Importantly, this Court stated that it **"**agree[d] that the evidence can permit the inference that at least National and Lafarge used the research analysts to signal to the other manufacturers during the class period. In other words, the interactions with research analysts might be considered a 'facilitating practice' of an agreement regarding price." <u>Id.</u> at 241.

### ii. As to CertainTeed:

The Court further decided that "Plaintiffs have submitted sufficient traditional conspiracy evidence for a jury to conclude that American, National, PABCO, and Lafarge had entered an agreement in violation of the Sherman Act. But, Plaintiffs have fallen short as to CertainTeed." <u>Id.</u> at 255. Specifically, the Court noted that "[u]nlike the other Defendants, there is a dearth ofevidence of any communications by CertainTeed or other plus factors that could create the inference of conspiracy." <u>Id.</u> at 257.

### d.  <u>Additional Class Settlements</u>

This Court granted direct purchaser plaintiffs' motion for preliminary approval of the proposed settlement with Lafarge on July 18, 2016. (ECF 427, Dkt. 13-2437.)  Home Depot timely submitted its letter of exclusion to opt out of the Lafarge settlement class on October 16, 2016. (<u>See</u> ECF 503, Ex. 1, p. 2.) The Court held a hearing on the fairness of the Lafarge settlement on December 7, 2016. Final judgment approving settlement was signed later that day.[4] (ECF 503.)

---

[4] There is no dispute that Home Depot participated in the class action settlement against the USG Defendants, in the early stages of the case, and in the class action settlement that took place

Both before and after opting out only as to Lafarge, Home Depot enjoyed the benefits of the class action and should be bound by those events and prior decisions in this case.

### e. *Homebuilders* **("Ashton Woods") Case**

Also opting out of the class actions, twelve of the largest homebuilding companies filed suit against various drywall manufacturers in the Northern District of California on March 17, 2015. (ECF 1, Dkt. No. 15-cv-1712.) The JPML transferred the case to this Court on April 1, 2015 (ECF 1.) Homebuilder Plaintiffs filed a series of complaints and amendments as follows, adding the three USG Defendants in its Amended Complaint (ECF 38):

1. Original Complaint (N.D. Cal. March 17, 2015) (ECF 1)
2. Amended Complaint (E.D. Pa. December 14, 2015) (ECF 38)
3. Second Amended Complaint (E.D. Pa. March 25, 2016) (ECF 56)
4. Third Amended Complaint (E.D. Pa. Aug. 12, 2016) (ECF 110)

In Homebuilders, this Court granted summary judgment in favor of USG Corp., the parent corporation,[5] and U.S. Gypsum, a subsidiary.  See In re Domestic Drywall Antitrust Litig., MDL No. 13-2437, 2019 WL 3254090, *34 (E.D. Pa. July 19, 2019). As to L&W, the other subsidiary, the Court did not grant summary judgment, ruling that "[t]here [wa]s some evidence upon which a jury might find that L&W acted as a 'conduit' of pricing information." Id. at *35.

Because, as detailed above, the USG Defendants had already settled with the direct and indirect purchaser classes, there can be no direct inference in this case that USG ever admitted,

---

subsequently.  Assuming Home Depot wins a liability verdict against Lafarge at the trial of this case, and secures damages based on jury's verdict, there is no question that Home Depot will have to make some accounting for the amounts that it already received as part of the class action settlement.  Dr. Kneuper makes no mention of this potential situation.

[5] The Court does not view the parent-subsidiary relationship as material to the legal issues presented in this case. See Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771–72 (1984) (activity of parent and subsidiary "must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act").

or was found by this Court, to be a co-conspirator. USG's class settlement occurred before any opinion on the summary judgment motion in the class action and <u>Homebuilders</u>. The Court cannot draw adverse inferences against USG Defendants because they settled the class action and were granted summary judgment in <u>Homebuilders</u>. Ultimately, The USG Defendants' legal status in Home Depot's present case against Lafarge is simply as former defendants. No ruling has been made that binds either Lafarge or Home Depot as to whether USG was a member of the conspiracy.

### f.   <u>Prior *Daubert* Decisions in this Litigation</u>

In these MDL cases, the undersigned allowed the admission of economic expert testimony when it was proper.

### i.   Direct Purchasers Action:

In the direct purchasers' class action, Defendants moved to preclude the expert testimony of Dr. Lamb, the Plaintiffs' expert economist, under <u>Daubert</u>. The parties engaged in extensive briefing and argument. The Court found Dr. Lamb's report was admissible to show class-wide injury and measurable damages in support of Plaintiff's Motion for Class Certification. (ECF 584, Dkt. No. 13-2437.) <u>See</u> <u>In re Domestic Drywall Antitrust Litig.</u>, 322 F.R.D. 188, E.D. Pa. Aug. 23, 2017) (Baylson, J.).

### ii.   Indirect Purchasers Action:

Likewise, Defendants moved to preclude Dr. Dwyer and Dr. Harris, economic experts for indirect purchasers' putative class action. The Court denied this Motion, writing that it had "no doubt as to Dr. Dwyer's or Dr. Harris's qualifications as expert economists," and finding "that their reports establish that they have acquainted themselves with the issues in this case, as well as the factual record; their reports are "reliable" and also "fit" to the issues and facts in this case." <u>See</u>

In re Domestic Drywall Antitrust Litig., No. 13-MD-2437, 2017 WL 3700999, *11 (E.D. Pa. Aug. 24, 2017) (Baylson, J.).

### iii. *Homebuilders* Action:

Three economic experts were also subject to a Daubert challenge in the Homebuilders opt-out case.  See In Re Domestic Drywall Antitrust Litig., No. 15-cv-1712, 2020 WL 1695434 (E.D. Pa. Apr. 7, 2020) (Baylson, J.). They were: (1) Defendants' expert David Hall; (2) Defendant's expert Dr. Robert Willig, and (3) Plaintiffs' expert Dr. Daniel Ingberman. The Court precluded Mr. Hall's testimony, and allowed Dr. Willig's and Dr. Ingberman's.

Mr. Hall's testimony was predicated on the pass-through defense, which was not applicable under California's Cartwright Act—the applicable law according to the Court's choice-of-law analysis—thus, his testimony was irrelevant and precluded. See id. at *16.

The Court found that Dr. Willig's analysis of cointegration was reliable; he used three methods to assess the data. His testimony was therefore admissible. See id. at *20–21.

As to Dr. Ingberman, the Court noted the Third Circuit's liberal standard for expert testimony about antitrust damages. Further, the Court explained that testimony about market shares were crucial to Plaintiffs' ability to prove damages, and Defendant's arguments went more to the weight of evidence rather than its admissibility. See id. at *24.

### III.   LAFARGE's MOTION TO EXCLUDE THE TESTIMONY OF DR. KNEUPER (ECF 83)

#### a.   Parties' Arguments

##### i.  Lafarge's Motion to Exclude Dr. Kneuper (ECF 83)

Lafarge identifies seven reasons why Dr. Kneuper's report should be excluded. The Court will review each in turn.

**First**, Lafarge argues that because of this Court's granted summary judgment in favor of

USG and CertainTeed, Dr. Kneuper should not be permitted to testify that USG, CertainTeed, or Georgia-Pacific engaged in explicit collusion, because there is no "fact in issue" related to these entities. His opinion on this point would therefore be irrelevant and unhelpful. (Def.'s Mot. to Exclude 18–21,  ECF 83 (citing  UGI Sunbury LLC  v. A Perm. Easement for  1.7575 Acres, 949 F.3d 825, 835 (3d Cir. 2020) (excluding expert testimony that "did not fit the case"); Compagnie Des Bauxites De Guinee v. Three Rivers Ins. Co., 2:04CV393, 2007 WL 7626483, *1 (W.D. Pa. June 7, 2007) (excluding expert testimony for lack of "fit" because experts proposed testifying on a legal issue that no longer required resolution))).

**Second**, Lafarge argues that the lack of evidence regarding USG, CertainTeed, and Georgia-Pacific excludes them from any alleged conspiracy. The remaining drywall manufacturers make up only 46% of the market, meaning that Lafarge would have allegedly joined a "minority conspiracy." Lafarge argues that Dr. Kneuper has not opined on how such a small conspiracy could have formed, why Lafarge would join it, or how this it could have impacted Home Depot. Therefore, he should not be permitted to speculate about any alleged "minority conspiracy." (Id. at 2, 21–23.)

**Third**, Lafarge contends that Dr. Kneuper's opinion on umbrella damages is irrelevant, unreliable, and untimely. Lafarge first states that umbrella damages are prohibited under Third Circuit law.  (Id. at 23–34.)  In support of this proposition, Lafarge cites two Third Circuit  cases. First, it argues that Mid-West Paper Products, a 1979 case, established a bar on umbrella damages because they are unduly "speculative" and would require an impermissibly "complex" "apportionment" of damages.  See Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573 (3d Cir. 1979). Next, Lafarge argues that In re Processed Egg Products, a 2018 case, shows that Mid-W. Paper still controls.  See In re Processed Egg Prods., Antitrust Litig., 881 F.3d 262, 276–77 (3d Cir. 2018) (reiterating Mid-West Paper's holdings that "antitrust plaintiffs must prove 'actual

causation' with 'reasonable certainty,' and provide the trier of fact enough to 'make a reasonable estimate of damages.'").

Lafarge further attacks Dr. Kneuper's opinion that Georgia-Pacific and USG "could have" engaged in tacit collusion, (Rebuttal Rpt. 8, 27, Ex. 2, ECF 91), because the Third Circuit has excluded opinions based on "mere possibility." (Mot. to Exclude at 26 (citing Schulz v. Celotex Corp., 942 F.2d 204, 208 (3d Cir. 1991); Saldana v. Kmart Corp., 260 F.3d 228, 234 (3d Cir. 2001))). Likewise, Lafarge argues that Dr. Kneuper impermissibly worked backwards from Dr. McClave's calcuations in assuming that they would apply to the umbrella damages hypothesis. (Id. at 28 (citing In re Zoloft Prods. Liab. Litig., 858 F.3d 787, 798 (3d Cir. 2017) ("conclusion-driven" analysis offered "without explanation" raises "real issues of reliability."))). And, Lafarge accuses Dr. Kneuper of offering no analysis or opinion as to whether Home Depot's hypothesis on umbrella damages is supported by McClave's model in the first place. (Id. at 29 (citing Comcast Corp. v. Behrend, 569 U.S. 27, 38 (2013) ("[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event."))).

**Fourth**, Lafarge argues that Dr. Kneuper should be precluded from opining on continuing effects of the alleged conspiracy because his initial report did not include them, Home Depot did not request discovery to support his hypotheses, and he makes tentative assertions that do not pass muster under Daubert. (Id. at 34–39.) Therefore, for Dr. Kneuper to opine on this would be speculation. (Id. at 36 (citing Willis v. Besam Automated Entrance Sys., Inc., No. 04-CV-0913, 2005 WL 2902494, *6 (E.D. Pa. Nov. 3, 2005), aff'd in part 228 F. App'x 246 (3d Cir. 2007) (excluding expert testimony where review of discovery materials are pure speculation and conjecture))).

**Fifth**, Lafarge contends that Dr. Kneuper should be precluded from opining that Dr.

McClave's regressions support his opinion because he has not independently validated McClave's methodology.  (Id. at 39 (citing Hered, LLC v. Seneca Ins. Co., No. 3:CV-06-0255, 2009 WL 4260667, at *2 (M.D. Pa. July 10, 2009) (cannot parrot ideas of other experts); In re TMI Litig., 193 F.3d 613, 716 (3d Cir. 1999), amended 199 F.3d 158 (3d Cir. 2000) (excluding expert due to failure to assess validity of opinions of other experts relied upon))).

**Sixth**, Lafarge argues that Dr. Kneuper goes beyond the territory of what an antitrust economic expert may do. Specifically, it contends that Dr. Kneuper should be precluded from testifying that the alleged conspiracy existed; he can only testify that behavior is *consistent* or *inconsistent with* conspiracy. Lafarge contends that Dr. Kneuper's existing testimony and report on this topic cross this line. (Id. at 39–41.)

**Seventh**, Lafarge argues that Dr. Kneuper should be precluded from opining on damages resulting from L&W purchases because he failed to evaluate Home Depot's automatically-passed-on price increases to customers. (Id. at 41 (citing Ill. Brick. Co. v. Illinois, 431 U.S. 720, 724 n.2 (1977) (buyer not damaged when cost-plus contract exists with supplier))).

Lafarge emphasizes that overall, each step of an expert's analysis must satisfy the Daubert standard (Id. at 16 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994) ("[t]he Third Circuit applies the Daubert standard to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case."))).

### ii. Home Depot's Response in Opposition (ECF 95)

At a threshold level, Home Depot disputes that Dr. Kneuper's report was untimely. It points out that Kneuper's initial report discloses the opinion that USG and Georgia-Pacific colluded by matching the behavior of other suppliers rather than competing. (Pl.'s Resp. in Opp'n 27, ECF 95.) What Lafarge calls untimely was Dr. Kneuper's answer to Dr. Willig in rebuttal. (Id.

at 27–28.) And, even if the report was in error, it would be harmless. (Id. at 28–29.)

Substantively, Home Depot contends that each of Dr. Kneuper's conclusions is admissible and helpful to the jury. (Id. at 1.)

Home Depot argues that Dr. Kneuper's report did not disregard the Court's prior summary judgment ruling. Rather, he has two opinions about it.  (Id. at 2–3). First, that the evidence in the Ashton Woods case was more consistent with explicit collusion between USG and other suppliers than with independent behavior by USG.  (Id. at 2.)  Home Depot points out that it has never litigated whether USG participated in the conspiracy. (Id.) The Court's summary judgment ruling came after exclusion of evidence against USG in the Ashton Woods case.  In this case, the  Court has determined that same evidence *is admissible* against Lafarge, which can allow a different outcome concerning USG.  (Id. at 2–3.)  Second, Dr. Kneuper  opined that USG behaved like a conspirator by raising price, eliminating job quotes, and artificially limiting production; the Homebuilders ruling does not foreclose this opinion.  Conduct can be independent of whether those entities agreed with other suppliers to coordinate their behavior.  And, Georgia-Pacific and CertainTeed's conduct helped the conspiracy succeed, even if they did not agree to coordinate behavior. (Id. at 3–4.)

Next, Home Depot contends that Lafarge's attack on umbrella damages fails, because Mid-West Paper, which Lafarge relies on, is no longer good law.  (Id.  at 4, 18.)   Mid-West Paper's blanket rule is inconsistent with the Supreme Court's subsequent decision in Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983), and Third Circuit precedent applying that case's test for antitrust standing.  (Id. at 18.)  Home Depot contends that Lafarge argues as if Dr. Kneuper's testimony must stand alone.  (Id. at 21.)  Instead, experts are just one piece of the puzzle under Third Circuit law, and courts must consider expert evidence in

conjunction with plaintiff's other evidence.  (Id.  at 21 (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1241 (3d Cir. 1993))).

Home Depot disputes Lafarge's position that Dr. Kneuper parroted Dr. McClave's opinion. Home Depot argues that it is not surprising that McClave's damages estimate is the same—prices would go up whether USG and Georgia-Pacific raised prices because they agreed to, or because they took advantage of conspiracy to raise prices alongside Lafarge and co-conspirators.  (Id. at 23.) Further, Dr. Kneuper can testify that Dr. McClave's regressions support his own opinions. (Id. at 41–43.)  Dr. Kneuper testified that he looked at McClave's report carefully when he received it.  (Id. at 41 (citing Kneuper Dep. At 28:10–15.))   Dr. Kneuper already had a general awareness of McClave's model and a good understanding of his methodology because the two experts are colleagues. Home Depot urges that cross-examination over exclusion is the proper vehicle to test Dr. Kneuper's knowledge of McClave's work. (Id. at 41–43.)

As for continuing effects, Home Depot argues that the fact Lafarge sold its drywall business does not end the inquiry. (Id. at 40–41.) Rather, the sale monetized Lafarge's participation in the alleged conspiracy.  (Id.)   The withdrawal defense is something Lafarge can present to the jury. (Id.  at 41.)

Finally, Home Depot argues that Lafarge's cost-plus argument does not warrant excluding Dr. Kneuper's proposed testimony—Lafarge does not offer evidence of the requirements for this exception to apply, such as a contract entered into prior to the alleged antitrust violation specifying the purchase/resale of a fixed quantity of drywall on a cost-plus basis. (Id. at 43–44.)

Home Depot also emphasizes that Third Circuit law liberally permits experts to testify, (id. at 4–5), and contends that Dr. Kneuper's opinion is the kind of opinion that courts regularly admit. (Id. at 6–7.)

### iii.   Lafarge's Reply in Support of its Motion (ECF 124)

**First**, Lafarge emphasizes that the Court has already granted summary judgment as to USG, and Kneuper offers no new evidence to revisit the ruling. (Reply 2, ECF 124.) Moreover, Lafarge notes that Home Depot's opposition does not offer any argument on whether Georgia-Pacific and CertainTeed conspired, and therefore Home Depot has conceded those points.  (Id.)

**Second**, Lafarge argues that Dr. Kneuper should be precluded from opining on an alleged "minority conspiracy," because he never opined on such a conspiracy without USG; in Lafarge's words, his "failure to grapple with the economic of an 'irrational' minority conspiracy render his opinions irrelevant and unreliable." (Id. at 2–4.) And, Lafarge argues that Home Depot's position on the alleged conspiracy contradicts Dr. Kneuper's report: while Home Depot claims that Kneuper's opinions "never depended on whether USG or Georgia-Pacific reached an unlawful agreement with other suppliers," Dr. Kneuper himself defined collusion as requiring an agreement. (Id. at 4–5.)  Further, Lafarge argues that the "deeper issue" is that Home Depot and Dr. Kneuper have "conflated conscious parallelism with an agreement," which has been rejected by the Third Circuit.  (Id. at 6 (citing Valspar Corp. v. E.I. Du Pont De Nemours and Co., 873 F.3d 185, 197 n.9 (3d Cir. 2017) (expert's evidence of "parallel price movement" is not necessarily evidence of an "agreement") and In re Pharm. Benefit Managers Antitrust Litig., 2017 WL 275398, at *18 (E.D. Pa. Jan. 18, 2017) (Jones, II, J.) (excluding expert testimony where expert's test "does not distinguish between unlawful and lawful explanations" of evidence))).  Accordingly, Lafarge argues, Dr. Kneuper's testimony would not be useful to a factfinder. (Id. at 7.)

**Third**, Lafarge continues to dispute that Dr. Kneuper's umbrella damages testimony are irrelevant, unreliable, and untimely. It argues that Home Depot's Response did not attempt to distinguish Mid-West Paper, but merely attempted to argue that the case was somehow "silently overruled" by subsequent case law. (Id. at 8.)

**Fourth**, Lafarge contends that Dr. Kneuper should be precluded from opining on 2014-15 damages. Lafarge argues that Home Depot cites no documents, and took no discovery, about 2014–15 regarding why the suppliers set prices during those years. (<u>Id.</u> at 13–14.) Accordingly, Dr. Kneuper lacks any evidence to evaluate his own hypotheses about post-conspiracy damages. (<u>Id.</u> at 15.) And, Lafarge also points out that this Court previously held there were insufficient allegations to suggest that 2014 and 2015 prices were the result of a conspiracy. (<u>Id.</u> at 16 (citing <u>In re Domestic Drywall</u>, 2016 WL 3453147, at *3.))

**Fifth**, Lafarge argues that Dr. Kneuper should be precluded from opining on Dr. McClave's regression analysis. Lafarge presses that whatever "general awareness" Kneuper may have had of McClave's analysis, he admitted that he did not see the actual report until it was served. (<u>Id.</u> at 18.) Lafarge argues that Dr. Kneuper's opinion is not any more reliable because he used McClave's indices in his own report, because he still admitted that he did not know several important aspects about the creation of McClave's demand index. (<u>Id.</u>)

**Sixth**, Lafarge argues that Dr. Kneuper should be precluded from arguing that the alleged conspiracy existed. Lafarge points out that in its opposition, Home Depot concedes that Kneuper cannot testify that a conspiracy existed. (<u>Id.</u> at 19.) But, Home Depot nevertheless proposes that cross-examination and proper instruction are sufficient to allow Kneuper's testimony on these points within admissible bounds. (<u>Id.</u>) Lafarge disagrees, arguing that it should not have the burden to "undo the damage" during cross-examination. (<u>Id.</u>)

**Seventh**, Lafarge argues that Dr. Kneuper should be precluded from opining on L&W purchases. It argues that Home Depot's argument about "fixed quantity" should be rejected, because Home Depot has not the met burden of proving that its purchases from L&W had a negative impact on Home Depot. (<u>Id.</u> at 20.)

### b. Discussion of Dr. Kneuper's Opinion

Dr. Kneuper's report concerns the allegedly collusive behavior of drywall manufacturers. (Kneuper Rpt., HD Ex. 1, ECF 91.) Dr. Kneuper states in a summary:

1. The drywall industry was susceptible to collusion by suppliers to fix and raise prices;

2. The drywall suppliers' behavior during the 2012–13 price increases was consistent with collusion and inconsistent with independent competitive behavior; and,

3. Suppliers successfully raised prices that Home Depot and other purchasers paid to levels inconsistent with competitive market forces.

(Id. at 3–5.). These permissible conclusions are, however, undermined by frequent and serious misstatements and/or erroneous reasoning which the Court cannot ignore.

Dr. Kneuper submitted a seventy-three (73) page initial report which makes a number of findings about the collusive nature of the drywall pricing and does so with opinions that are above and beyond the appropriate limits of an economist's testimony in an antitrust case.

Although Dr. Kneuper does use, in his summary stated above, on occasion, traditional economic language that certain evidence was either consistent or inconsistent with collusive behavior or competition, his extensive verbosity about the evidence, which was the product of extensive discovery, and was detailed in this Court's opinions on both class action certification and summary judgment, ventured far and wide over and above what was "consistent" or "inconsistent."

Furthermore, Dr. Kneuper frequently refers to what he calls the "leading" manufacturers, as acting with "collusion" and whether by a slip of a pen or purposeful phraseology, his report frequently includes Georgia-Pacific and CertainTeed in this category even though the first had never been sued, and the second had been granted summary judgment. He also includes USG,

which settled early and as to which this Court has never made any findings. These important facts are never mentioned.

Dr. Kneuper's extensive ninety-nine (99) page rebuttal report, although primarily devoted to refuting the opinions of defense expert Dr. Willing, nonetheless contains much of the same excessive language and attribution of wrongful activity to entities, particularly Georgia-Pacific and CertainTeed, that are improper in this case.

Examples of Dr. Kneuper's overblown language are stated below.

Dr. Kneuper attempts to disguise his improper conclusions of fact as being economic, rather than legal:

> "I use the term collusion throughout this Report based on the economic, rather than the legal, use of the term.  From an economic perspective, collusion occurs when a set of firms agrees to limit competition by, for example, increasing prices above competitive levels and/or reducing output below competitive levels, in order to increase profits."

Kneuper Rpt. 4 n.5.

Dr. Kneuper cannot invent semantic sophistry to obscure the obvious similarity between these two parameters—economic and legal.  His report is redundant with his equating economic and legal collusion.  His province is the former; the latter belongs to the jury.

Dr. Kneuper does not exclude USG, Georgia-Pacific, or CertainTeed from his references to the "leading drywall suppliers" and as Lafarge's "co-conspirators:"

> "The leading Drywall Suppliers in the United States, including Defendant Lafarge, its co-conspirators, and Georgia-Pacific, are described below."

Id. at 8 (listing drywall suppliers, including CertainTeed, Georgia-Pacific, and USG.)

Dr. Kneuper's improper "massaging" of his lengthy reiteration of the factual background of the case, including defendants who settled early, and defendants who settled after their summary

judgment was denied, plus the unique situation concerning CertainTeed and Georgia-Pacific, may satisfy the expectations of his intended audience, but does not comport which established <u>Daubert</u> precedent.

This Court does not know for sure if Dr. Kneuper himself did the detailed review of underlying documents and deposition testimony, or rather, if he is summarizing the contends of this Court's 100-plus page review of the evidence, in coming to the decisions to certify a class and then deny summary judgment.

Whatever process Dr. Kneuper used, the report fails because he has extended the license he has to give economic opinions by making comments about certain parties that are simply not supported by the record.

Dr. Kneuper's lengthy review of the evidence is not close to what might be called "plain vanilla,"—it is an advocate's statement, by its phraseology, which goes far beyond what prior experts in this case have written and what this Court has held.  Dr. Kneuper is an expert, not an advocate, and the frequent tendencies in his report to go beyond economic analysis and into advocacy require that his report, in large part, be excluded.

The Court concludes that Dr. Kneuper's report must be excluded under <u>Daubert</u>, because it:

1. Fails to fully disclose that Georgia-Pacific was never sued.

2. Fails to disclose that the Court granted summary judgment to CertainTeed.

3. Fails to discuss, that if any sales of drywall by Georgia-Pacific and CertainTeed were to be included in any damage calculations by Home Depot, there could be a serious over inflation of damages to which Home Depot was entitled and for which Lafarge could have been liable—but none of this appears in either the original report or the rebuttal report by Dr. Kneuper.

4. Although there is no question that USG is a major supplier of drywall in the United States, and in particular may be Home Depot's major supplier, this Court never made any conclusions as to the evidence concerning USG or its affiliates

in the class action proceedings. In the <u>Home Builder</u> case, the Court did grant summary judgment to the parent corporation and one of its affiliates, albeit not to its L&W affiliate.

5. By constantly using the phrase "leading" drywall suppliers and ignoring the above factors concerning Georgia-Pacific, CertainTeed and USG, the report is potentially misleading and cannot form a basis of an economist opinion to be presented at the trial of this case against Lafarge only.

Dr. Kneuper's report includes several improper references inferring or concluding that all these "leading" drywall suppliers conspired to raise prices:

1. "The evidence also supports that the leading Drywall suppliers, including Defendant Lafarge, were engaging in various communications starting in early 2011 as part of a growing consensus to coordinate a series of price increases . . . ." (<u>Id.</u> at 4.)

2. "[T]he evidence supports that the Drywall suppliers, including Defendant Lafarge, engaged in various coordinated actions in order to achieve substantial and sustainable price increases in 2012 and 2013." (<u>Id.</u> at 5.)

3. "[W]ith respect to market outcomes, the economic evidence shows that Drywall suppliers, including Defendant Lafarge, were able to substantially increase Drywall prices during the time period of the alleged collusion, and that these outcomes were not explained by competitive market factors." (<u>Id.</u> at 5.)

4. "One of the previous seven series of pre-collusive price increases was led by CertainTeed, but this differed in several significant respects from the collusive price increases." (<u>Id.</u> at 30.) Even though this remark may exonerate CertainTeed's past behavior of price increases, Dr. Kneuper does not acknowledge evidence in the record, such as this, that may have led to CertainTeed being granted summary judgment.

5. "When asked about [American Gypsum] leading up prices in September 2011, CertainTeed's Steve Hawkins testified that, 'I don't recall American leading an increase in the past. You know, they are a follower much like CertainTeed, so in that respect, I was a bit surprised.'" (<u>Id.</u> at 32.)

6. "The evidence supports that the leading U.S. Drywall suppliers were engaging in various communications starting in early 2011 as a part of a growing consensus to coordinate a series of price increases that would lead to substantial and sustainable increases in the price of Drywall."  (Id. at 35.)

7. "[Lafarge's VP of Sales Stephen] DeMay further stated with respect to USG that, [i]f we see them raise their price to their break-even number of $125 mil-net, there will be a collective respon[se] from all of us – National, Lafarge, CertainTeed – we all respond.'"  (Id. at 40–41.)

8. "[O]n August 13, 2010, USG's Greg Salah (Senior Vice President of Sales on National Accounts) reported to USG's Jim Metcalf (President and CEO) that USG's attempt to increase prices was causing it to lose business to various competitors who lowered their price to take market share, including National, CertainTeed, and American."  (Id. at 44–45.)

There are additional misleading and overbroad conclusions in Dr. Kneuper's rebuttal

report:

1. "Dr. Willig additionally argues that Home Depot could not have been impacted because 86% of its purchases were from two suppliers whom he classifies as 'non-conspirators': Georgia-Pacific, who was not expressly alleged to have been a conspirator, and USG, based on the Court decision in the Homebuilders case.

* * *

[E]ven if USG and GP did not engage in illegal explicit collusion, they could have engaged in collusion that primarily involved tacit cooperation with other Drywall suppliers that affected Home Depot.  Indeed, there is substantial evidence that USG in fact acted collusively in 2012 and 2013." (Dr. Kneuper Rebuttal Rpt. 7–8, HD Ex. 2, ECF 91.)

2. "[Dr. Willlig] dismisses these factors due to what he characterizes as 'non-conspirators' (USG, GP, and CertainTeed).  Yet he again ignores the fact that the so-called 'non-conspirator' suppliers engaged in the various collusive behaviors that I described in my Initial Report.  More generally, even if only some of the Drywall suppliers engaged in illegal price fixing, there still remains a strong potential for higher prices due to collusion."  (Id. at 8.)

21

> 3. "Dr. Willig also ignores substantial evidence, discussed in my Initial Report, that USG did explicitly collude with other suppliers in 2012 and 2013." (<u>Id.</u> at 28.)

Both the initial and rebuttal opinions of Dr. Kneuper are very lengthy summaries of the evidence, not due to his economic opinions, but because he has chosen to summarize, if not reiterate, many of the findings this Court made in its prior opinions about the conduct of the various suppliers of drywall. This discussion, purportedly to establish grounds for Home Depot to succeed in this lawsuit against Lafarge, is an overly lengthy repetition of what has been going on in this case over the last ten years but adds very little economic analysis. The length of the report, and its overly broad mischaracterizations of the evidence, has caused significant delay in the analysis and decision-making by this Court in reviewing materials, and coming to what the Court believes is a fair decision that Dr. Kneuper's report must be rejected.

Dr. Kneuper could have summarized the evidence as to Lafarge, in this matter, without repeating all of the other evidence, and in doing so, Dr. Kneuper has presented a false impression of the drywall industry by his over inclusive characterizations, including the implications that Georgia-Pacific and CertainTeed were conspirators by overbroad use of language as shown by the excerpts above.

Excerpts from Dr. Kneuper's deposition contain the same overreaching:

> 1. "From my perspective, Georgia-Pacific acted in an economically collusive manner, generally similar to the other drywall suppliers." (Kneuper Dep. 51:23–52:1, HD Ex. 8, ECF 95.)

> 2. "There's certainly evidence that's suggestive that CertainTeed may have participated in explicit collusion." (<u>Id.</u> at 256:9–10.)

> 3. Dr. Kneuper testified there was some evidence "that CertainTeed would act in a certain fashion, so that may be suggestive of CertainTeed being part of an explicit collusion." (<u>Id.</u> at 257:7–10.)

Basically, his opinions must be stricken because they cross the line from economist to attorney–juror–judge, and because they lack a fundamental acknowledgement of the unique and important procedural history in this case that binds Home Depot as a member of the direct purchaser settlement class, and contradicts his conclusions. Even though the precise procedural background and facts of record are unique, principles of issue preclusion and the law of the case are also applicable here. Home Depot missed opportunities to free itself from the grips of these doctrines, most notably not initiating any significant discovery beyond that of the MDL class action in its opt-out suit against Lafarge. (May 18, 2021 Tr. 21:10–14; 23:11–17.)

### i.  Improper Economic Expert Opinion

As to the first reason for exclusion, this Court will refer to its opinion on expert testimony in the Direct Purchaser Class Action, where the Court found that Dr. Lamb, the Plaintiffs' economist, opinions satisfied <u>Daubert</u> standards because they stayed within the  appropriate boundaries of an expert. Dr. Lamb limited his opinion testimony to economic conclusions that were "consistent with" evidence of defendants' behavior, reached from an economic point of view. The Court cannot say the same for Dr. Kneuper. (See Order Re: Pending <u>Daubert</u> Motion, ECF 385, Dkt. No. 13-2437.)

### ii.  Unique Procedural History

The second reason for exclusion will be extensively explained and justified by the following discussion, which the Court believes is appropriate given the unique procedural history and the undisputed facts and prior rulings of the Court. After substantial research, this Court has not found any case with a parallel procedural history, or any precedent in which an opt-out party has presented opinions from an expert that are contrary to fundamental court rulings under which that party benefitted substantially.

Nonetheless, the prior proceedings in the MDL are very relevant and can be referenced by this Court in making conclusions about what evidence was in the record about particular drywall entities. MDL consolidation gives opportunities to litigants to use the consolidated discovery that is at the heart of § 1407 to build a case against a defendant. But the contrary is also true: if an opt-out plaintiff in a transferred case does not take that opportunity, it cannot ignore the conclusions of the MDL Court resulting from the discovery in the other cases transferred for pretrial proceedings.

Other courts have taken cautious approaches when presented with similar arguments in a class action or MDL context.  See, e.g., Meridia Prods. Liab. Litig. v. Abbott Labs., 447 F.3d 861, 869 (6th Cir. 2006) ("Plaintiffs offer no authority for the proposition that where, as here, hundreds of named litigants and certified classes are consolidated by an MDL Panel, a party may limit the effect of a consolidated order merely by filing a new complaint."); In re Urethane Antitrust Litig., MDL No. 1616, 2013 WL 65879772, *3 (D. Kan. Dec. 16, 2013) ("allowing opt-outs to benefit from a favorable class action decision without also carrying the risk of an adverse decision would" create perverse incentives).

This Court must be careful to respect Home Depot's constitutional right to have its own claims, and proceed to a jury trial, against Lafarge because Home Depot opted out of the class settlement as to Lafarge. (Resp. in Opp'n to Mot. for Summ. J. 10, ECF 94.) For not one minute does this Court intend to deprive Home Depot of its right to seek damages against Lafarge. However, these opt-out rights do not give Home Depot any greater evidentiary rights that apply across the board, no do they give Home Depot the right to use conduct, or sales of drywall, by Georgia-Pacific or CertainTeed, for any purpose in its claims against Lafarge. The Court does not rely on the fact that USG was granted summary judgment in the Homebuilders case, because that

decision is not binding on Home Depot.

Here, what is most important is that Home Depot, its counsel, and its expert Dr. Kneuper have conveniently forgotten this case's history, and argue that because Home Depot opted out of the settlement as to Lafarge only, it can retain an expert, who can sing a different "tune," in separate ways distinctly "out of tune" with the consequences of the undisputed facts and judicial decisions by the MDL Court.  This is not merely a case of Home Depot wanting to "have its cake and eat it too," but rather about Home Depot "having taken its money and ignored the rulings of the Court"— acting as if by opting out and proceeding against Lafarge, it is privileged to proceed on a clean slate. To countenance this strategy would be to basically ignore the many rulings that this Court has made over the prior ten years of this litigation. No way.

Consequently, Dr. Kneuper has made three fundamentally improper extensions of the factual scenario.

First, Dr. Kneuper's conclusions about Georgia-Pacific must be excluded. No party has ever litigated against Georgia-Pacific, and it was not part of the MDL, its conduct and its sales are simply not relevant in this case for any purpose.

Second, as to CertainTeed, Home Depot has waived any right to make any claim or to use Dr. Kneuper's "different perspective" to conclude that CertainTeed's behavior was "consistent with the economics of collusion." (See Kneuper Dep. 53:7, HD Ex. 8, ECF 91.) Home Depot did not take any steps to initiate discovery against CertainTeed. Home Depot relying on discovery about CertainTeed would have run contrary to this Court's conclusion that CertainTeed was entitled to summary judgment because there was insufficient evidence it joined a conspiracy. The record of this case shows that Home Depot attempts to avoid this Court's conclusions about CertainTeed, but at the same time, did nothing to build its own case against CertainTeed as a co-conspirator, and

cannot use Dr. Kneuper's opinions to take the place of real facts.

Lastly, as to USG, although the history is a bit more complicated, it is largely the same. Because USG and its subsidiary L&W settled very early in the class action case, this Court had no occasion to conclude anything about their role in the alleged conspiracy in the summary judgment opinion. In this Court's opinion granting class certification of direct purchasers, the Court noted that USG Corp. directed the pricing strategy of and generally controlled the relevant actions of its subsidiaries, L&W and U.S. Gypsum.   See In re Domestic Drywall Antitrust Litig., 322 F.R.D.188, 197 (E.D. Pa. 2017) (Baylson, J.); see also supra 7 n.5, noting the legal significance of this relationship for present issues pursuant to Copperweld.

In the oral argument held on May 18, 2021, counsel for Home Depot stated that new documents from additional discovery could be found by locating exhibits with the "Home Depot" prefix in the bates numbering.[6]  The Court has reviewed those exhibits and concludes that there are no incriminating documents or anything else that could serve as a basis to find that USG conspired, as Dr. Kneuper concludes.  Whatever the additional exhibits do or do not show, Home Depot, as far as the Court can tell, did not take any depositions from any of these companies' representatives—another reason why Dr. Kneuper's conclusions about them are in question.

Home Depot's briefing relies on semantics over reality in trying to disguise Dr. Kneuper's opinion as being solely that of an economist.  (See, e.g., Opp'n Br. 20 (arguing that Dr. Kneuper uses "collusion" to include coordination "even without agreement."))  As far as all three of these companies are concerned, there was nothing to stop Home Depot, as an opt-out, from seeking leave to file an amended complaint naming them as defendants.  See, e.g., Blake v. JP Morgan Chase Bank NA, 927 F.3d 701, 708–09 (3d Cir. 2019) ("under American Pipe, a pending class action

---

[6] Home Depot Exs. 26–35 (ECF 90) contain the Home Depot prefix in the bates numbering, and therefore would be new discovery as identified by Home Depot's counsel.

tolls the time . . . for putative class members' individual claims") (citing <u>American Pipe & Const. Co. v. Utah</u>, 414 U.S. 538 (1974)).

The Court must conclude that Home Depot cannot retain an expert who presents opinions contrary to fundamental events that took place while Home Depot was a member of the settlement class in the direct purchaser action and benefitted from that settlement. This conclusion flows from simple common sense and conceptual principles: it disallows a party from "eating from one hand," then denying with the other hand that such a meal had ever taken place.

### iii. Issue Preclusion

The Third Circuit has stated:

> The prerequisites for the application of issue preclusion are satisfied when: "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment."

<u>Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.</u>, 63 F.3d 1227, 1231–32 (3d Cir. 1995) (quoting <u>In re Graham</u>, 973 F.2d 1089, 1097 (3d Cir. 1992) (brackets omitted)).

The above principle applies to Home Depot in this case.  First, identical issues were decided in this Court's prior opinions and adjudications: whether the pertinent manufacturers violated the Sherman Act. Second, that issue was actually—and extensively—litigated in this Court. Third, the issue was determined by a final and valid judgment in favor of the direct purchaser class, including Home Depot, against all defendants.  <u>See</u> <u>In re Domestic Drywall</u>, 163 F. Supp. 3d at 258, 260; <u>see also</u> <u>In re Brown</u>, 951 F.2d 564, 569–70 (3d Cir. 1991) (judgment sufficiently final if parties are heard, a reasoned opinion is filed, and finality is sufficiently firm and reliable).  This final judgment included all the prior rulings made as of that time, including the grant of summary judgment to CertainTeed.

Home Depot has preserved its claims against Lafarge, because it opted out as to Lafarge. Although Home Depot preserved its right to a trial against Lafarge, it cannot ignore what had happened as part of this final class action judgment:  summary judgment in favor of CertainTeed, no findings about USG, and the fact that Georgia-Pacific was never a party.  Home Depot can no longer sue USG or CertainTeed, but it is attempting an "end run" around this legal principle by having Dr. Kneuper imply, state, or assume that those entities colluded.  And it attempts to use this "end run" to boost its damages against Lafarge.

Fourth, the determination of the issue was essential to the prior judgment because the class-wide settlement allocated damages to all members of the class, and the final judgment determined claims.  Home Depot still has its claim against Lafarge, but is bound by the underlying events and court rulings.

That final judgment benefited Home Depot by enabling it to prevail as a class member; it obtained a monetary award.  Crucially, the fact that Home Depot opted out as to Lafarge does not now allow Home Depot to escape the consequences of settling against the other defendants, which include rulings by the Court that Dr. Kneuper and Home Depot now ignore.  See, e.g., Wolstein v. Docteroff, 133 F.3d 210, 216 (3d Cir. 1997) (affirming issue preclusion where "the record establishes that the . . . court adequately considered all the relevant issues" and the court "wrote a thorough and thoughtful opinion"); Del. River Port Auth. v. Fraternal Ord. of Police, 290 F.3d 567, 572 (3d Cir. 2002) ("Under the doctrine of issue preclusion, a determination by a court of competent jurisdiction on an issue necessary to support its judgment is conclusive in subsequent suits based on a cause of action involving a party or one in privity.")

### iv.  Law of the Case

The "law of the case" doctrine generally applies only to parties within the same case.  See

In re Cont'l Airlines, Inc., 279 F.3d 226, 233 (3d Cir. 2002) ("When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). Of importance here, the doctrine has been applied in this District to a previous MDL case: "[E]arlier decision[s] by this Court in this very same multidistrict litigation . . . establish[] the law of this case." Phila. Hous. Auth. v. Am. Radiator & Standard Sanitary Corp., 323 F. Supp. 381, 383 (E.D. Pa. 1970) (Harvey, J.).   Apart from MDLs, the doctrine is also applicable is similarly complex litigation with multiple stages.   See, e.g., In re Pharm. Benefit Managers Antitrust Litig., 582 F.3d 432, 439 (3d Cir. 2009) (quoting Arizona v. California, 460 U.S. 605, 618, (1983)) ("When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); Hamilton v. Leavy, 322 F.3d 776, 786–87 (3d Cir. 2003) ("The law of the case doctrine 'limits relitigation of an issue once it has been decided' in an earlier stage of the same litigation." (quoting In re Cont'l Airlines, Inc., 279 F.3d at 232)).   The doctrine is discretionary.   Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co., 988 F.2d 414, 429 (3d Cir.1993) (noting that it is within the trial court's discretion to decide whether the law of the case doctrine applies).

The fact that all relevant complaints were consolidated before this Court by the JPML, and that Home Depot benefited from the direct purchaser settlement, allows this Court to rely on the law of the case doctrine to support its conclusions about Dr. Kneuper. See Phila. Hous. Auth. 323 F. Supp. at 383 (the law of the case "is particularly applicable to multidistrict litigation in which the presence of a large number of diverse parties might otherwise result in constant relitigation of the same legal issues").

Home Depot relies on In re TMI Litigation, a Third Circuit case, for the proposition that "consolidation does not merge the suits into a single cause, or change the rights of the parties, or

make those who are parties in one suit parties in another." (See Home Depot's Supp. Br. 2, ECF 133 (citing 193 F.3d 613, 724 (3d Cir. 1999))). But that case presents a different procedural history: a portion of the consolidated plaintiffs had not litigated their claims and had not presented any argument to the district court. Here, Home Depot did litigate and argue—extensively—to this Court during the prior MDL proceedings. Simply because it opted out as to Lafarge cannot erase its participation in the case as to the other defendants, especially where Home Depot left the record unchanged. See 18B Wright, Miller and Cooper, Federal Practice & Procedure: Juris 2d § 4478.5 (2002) ("If an attempt is made to press the same fact issue for a second time on an unchanged record, law-of-the-case reluctance approaches maximum force.").

### v.    Umbrella Damages

The Court will not, at this time, accept or reject Dr. Kneuper's view on umbrella damages. The Court believes that any justified use of the umbrella damages theory in this case, depends on showing that non-conspirators raised their own prices because of higher prices put into effect by stronger competitors who did conspire. See, e.g., In re Processed Egg Prods. Antitrust Litig., 881 F.3d 262, 274–76 (3d Cir. 2018).  In view of the intensive briefing on this issue by the parties, the Court will consider the relevant arguments after Dr. Kneuper submits a new report, and perhaps wait to make a final decision until trial.

### vi.    Minority Conspiracy

The Court rejects Lafarge's attack on Dr. Kneuper's inclusion of analysis regarding the alleged "minority conspiracy."  Dr. Kneuper's analysis on this topic may be adjusted in his new report, and ultimately, whether or not Lafarge joined a conspiracy comprising a certain share of the drywall market is for the jury to decide.

### c.    Concluding *Daubert* Analysis

In sum, the Court concludes that Dr. Kneuper's report and testimony do not pass muster under Rule 702 or <u>Daubert</u>.  The Court's role is to "function[] as a gatekeeper to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." In re Domestic Drywall Antitrust Litig., 15-cv-1712, 2020 WL 1695434, \*14 (2020) (E.D. Pa. Apr. 7, 2020) (Baylson, J.) (citing <u>Daubert v. Merrell Dow Pharma., Inc.</u>, 509 U.S. 579, 589 (1993) (internal quotation marks omitted).

The Third Circuit has interpreted <u>Daubert</u>, in conjunction with Rule 702, to require a "trilogy of restrictions" on expert testimony.  <u>See Langbord v. U.S. Dep't of Treasury</u>, 832 F.3d 170, 194 (3d Cir. 2016).  The expert must be (A) qualified; the methodology or technique must be (B) reliable; and the testimony must (C) fit the facts and context of the case and "assist the trier of fact."  <u>Id.</u> at \*15 (citing <u>Schneider ex rel. Estate of Schneider v.</u> Fried, 320 F.3d 396, 404 n.3 (3d Cir. 2003)).

The parties do not dispute that Dr. Kneuper is qualified.  However, the reliability and fit of his methods and testimony are vigorously attacked by Lafarge, and the Court, as detailed in the above discussion, agrees that Dr. Kneuper's expert report must be precluded.  By seriously misrepresenting, omitting, and ignoring various aspects of the prior proceedings in the MDL, Dr. Kneuper and Home Depot have not proffered expert testimony that fits this case and stems from reliable methodology.

## IV. OVERVIEW OF DR. MCCLAVE's OPINION

Dr. McClave was assigned to determine the amount, if any, by which drywall prices sold to Home Depot increased due to the alleged conspiracy.  Using econometric methodology, he demonstrated that prices were elevated beyond normal competitive levels during the alleged conspiracy period.  Specifically, he used two analyses to estimate Home Depot's damages to total

between $77 million and $101 million.

    **a.  <u>Parties' Arguments</u>**

          **i.  Defendant's Motion to Exclude Proposed Expert Testimony of Dr. McClave (ECF 84)**

Lafarge makes five main arguments in support of exclusion.

**First**, Lafarge argues that Dr. McClave gives no opinion endorsing an alternative damages model and doesn't rely on them. Lafarge contends that Dr. McClave relied on a "primary" model, but Home Depot's counsel subsequently requested different models. Dr. McClave refused to endorse[7] either of those two alternative models; therefore, Home Depot's counsel substituted their judgment for the expert and have "grossly inflate[d]" those damage estimates. (Id. at 5–11.)

**Second**, Lafarge argues that Dr. McClave's analyses do not fit the facts of the case. (Id. at 11–17.) A familiar point from the briefing on Dr. Kneuper is made: despite this Court's never ruling in the class actions whether there was sufficient evidence of USG's participation in the alleged conspiracy, Dr. McClave assumed that USG did participate. (Id. at 12–15.) Lafarge emphasizes that Home Depot cannot challenge this ruling because it never took any new discovery from USG. Likewise, Lafarge argues that Dr. McClave's analysis improperly includes Georgia-Pacific purchases, even though Home Depot cannot legally recover from Georgia-Pacific because it was never alleged to be a conspirator.

**Third**, Lafarge argues that Dr. McClave omitted variables for Home Depot and all other plaintiffs in the MDL. (Id. at 17–20.) Lafarge points out that Home Depot departed from the methodology in the MDL, because Dr. McClave's analysis is the only expert's analysis to not account for interest rates. Lafarge characterizes this as Home Depot cherry-picking variables to

---

[7] Dr. McClave unequivocally disclaimed any reliance on alternative calculations. (Ex. 3, McClave Dep. 56:25–57:3.)

maximize its damages.

**Fourth**, Lafarge argues that Dr. McClave's opinions related to the existence of the alleged conspiracy should be excluded.  (Id. at 20–23.)  As a threshold issue, Lafarge argues that Dr. McClave is not an economist.  And, he intends to testify about an alleged conspiracy using the buzzword "consistent" with conspiratorial conduct, but because his models assume that a conspiracy existed, he is recasting his assumptions as evidence.

**Fifth**, Lafarge argues that Dr. McClave's opinions must be excluded to the extent Dr. Kneuper's are excluded.  (Id. at 23–24 (citing Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781, 790 (3d Cir. 1979); Elcock v. Kmart Corp., 233 F.3d 734, 754 (3d Cir. 2000)).

### ii.    Home Depot's Response in Opposition (ECF 92)

Home Depot first responds that there is not a high bar for expert testimony in the Third Circuit, especially for damages in antitrust price-fixing cases.  See In re Niaspan Antitrust Litig., 464 F. Supp. 3d 678, 722–23 (E.D. Pa. 2020) (DuBois, J.) (recognizing this principle).  (Resp. in Opp'n 9, ECF 96.)

Home Depot also points out that Dr. McClave used multiple regression analysis to make his calculations.  (Id. at 4–6.)  This is a standard and widely accepted methodology**,** which Lafarge's expert agrees is reliable, and uses himself.  Home Depot also disputes Lafarge's estimations of damages are inflated.  It argues that the freight-inclusive and gross-price calculations are proper, and are actually conservative.  (Id. at 10–11.)  Home Depot emphasizes that Dr. McClave did not abandon his independent judgment or blindly accept assumptions from Home Depot.  (Id. at 18–19.)  Home Depot has the right to ask Dr. McClave to determine whether the data support any given category of damages—that is not supplying him facts nor assumptions.

Home Depot also accuses Lafarge of trying to muddy a clear principle:  price-fixing

conspiracies can continue to raise prices even after collusion ends.  As long as a conspiracy was a "material" cause, plaintiffs are entitled to damages.  See In re Domestic Drywall Antitrust Litig., 322 F.R.D. at 231–32 (quoting In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1183 (3d Cir. 1993)).

As to the inclusion of USG and Georgia-Pacific in the analysis, Home Depot argues that Dr. McClave's model allows the trier of fact to calculate damages whether or not Home Depot may recover for overcharges it paid to these companies.  (Id. at 25–26.)

Home Depot also responds that Dr. McClave did not improperly omit interest rate variables.  (Id. at 27–38.).  Showing that other experts have taken a different approach with respect to one variable does not meant that another expert's approach is unreliable.  (Id. at 27–28.)

### iii.    Lafarge's Reply in Support (ECF 125)

In reply, Lafarge reiterates the arguments made in its opening brief.  First, it argues that Home Depot admitted that it will not introduce the alternative models that include freight costs and exclude discount and rebates.  If they are introduced, however, they should be excluded as unreliable and misleading.  (Reply 2–3, ECF 125.)

Second, Lafarge argues that any calculations that reflect post-2013 damages modeling should be excluded because they are not tied to any plausible economic theory.  (Id. at 4–6.)

Third, Lafarge reiterates that damages related to USG should be excluded as improper and unavailable as a matter of law. Likewise, he argues as a fourth point that Dr. McClave should be precluded from arguing about damages stemming from L&W, because he never analyzed whether Home Depot suffered any injury related to them.  (Id. at 6–8.)

Fifth and finally, Lafarge presses that interest rates are a key variable, and Dr. McClave should not be able to "backfill" his analysis by subsequently accounting for fluctuations after

completing his initial analysis.  (<u>Id.</u> at 9–12.)

**b.  <u>Analysis</u>**

The Court will not decide any of these issues at present.  Dr. McClave should modify his report after Dr. Kneuper does the same.

## V.    <u>CONCLUSION</u>

Because of these defects in Dr. Kneuper's report, it will be stricken, with leave for Dr. Kneuper to serve a revised report within sixty (60) days.  Dr. McClave may have thirty (30) days thereafter to revise his report.

O:\Alex.2020\Cases\Home Depot v. Lafarge, 18cv5305\Kneuper memo_8.20.21_2pm.docx